**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-2330

UNITED STATES OF AMERICA

v.

DAVID GREEN,

Appellant

On Appeal from the United States District Court
for the District of New Jersey
District Court  No. 1-06-cr-00612-001
District Judge: The Honorable Robert B. Kugler

Argued March 10, 2010

Before: AMBRO,  SMITH, and ALDISERT, *Circuit Judges*

(Filed: August 9, 2010)

Mark S. Greenberg (argued)
LaCheen Wittels & Greenberg
1429 Walnut Street, Suite 1301
Philadelphia, PA 19102
        *Counsel for Appellant*

Ralph J. Marra, Jr.
George S. Leone
Jennifer H. Chin
Steven G. Sanders    (argued)
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
        *Counsel for Appellee*

---

OPINION

---

SMITH, *Circuit Judge.*

A jury convicted David Green of attempted possession with intent to distribute 500 grams or more of cocaine.  Green appeals, arguing that the District Court erred by allowing the Government to introduce evidence that he threatened to kill an undercover police officer.  We will affirm.

I.

2

In March of 2006, Green was arrested in New Jersey on state-law drug charges. This arrest came about in part through the efforts of an undercover officer identified in the record as "A.G.," "Gus," and "Gussy."

Three months later, Green and an acquaintance, Jacqueline Stahl, were in a vehicle together when they drove past A.G.'s home. Green told Stahl that he was going to blow up A.G. as retaliation for getting him arrested. He stated his desire to purchase dynamite and blasting caps, as well as cocaine. Alarmed, Stahl contacted law enforcement, reported what Green had said, and agreed to act as an informant.[1] In the weeks that followed, Stahl, acting at the direction of the FBI, surreptitiously recorded a series of conversations with Green about the possibility of acquiring dynamite and cocaine through "Frankie," Stahl's boyfriend from Florida.

On July 1, 2006, Stahl and Green met at a convenience store in Mantua, New Jersey. Green confirmed his interest in buying dynamite and blasting caps. Stahl told Green that Frankie could get him six sticks of dynamite. The conversation then turned to the possibility of buying cocaine through a man Green knew in Miami. Stahl volunteered to drive to Florida to consummate the deal. Green agreed that Stahl should make the trip, because she was "middle class looking" and would not

_____

[1] Three of Stahl's brothers were active or retired state troopers.

3

arouse suspicion. Later, the conversation returned to the subject of explosives. Green said, "look, serious . . . let's do some dynamite." Stahl asked him what he planned to do with it, and told him he'd better not kill anyone she knew, or "go blow up that Gus's house." Green remained coy, saying only that he wanted to keep "something handy" because he intended to do "something." When Stahl pressed him, asking "who you got in mind?", Green responded, "you never know."

On July 7, Stahl and Green again discussed the possibility of buying cocaine and dynamite from Frankie. Stahl asked Green whether he needed small sticks of dynamite, such as would be used to blow up a car or a tree stump, or big sticks, to destroy a building. She again asked whether he intended to use it to blow up A.G.'s home. Green steadfastly refused to specify his target, but he did ask Stahl to tell him more about A.G. The remainder of the conversation revolved around the terms of the deal. Stahl told Green that Frankie would accept "fifteen hundred [dollars] and an ounce of coke for six little ones or 300 apiece for the small ones," or "2 ounces of coke and a thousand cash" for "the big ones." Green told Stahl that these prices were too high. He was also skeptical that Frankie would have any use for cocaine from New Jersey, since the drug was abundant in Florida. Stahl promised to find out how much cash Frankie would require.

In the weeks that followed, Green's interest in buying dynamite appeared to wane. At one meeting, Green told Stahl

4

that the dynamite was on the "back burner" because he was low on money. But he was still interested in cocaine, which he could sell for a hefty profit. On July 19, Stahl told Green that Frankie would sell him a kilogram of cocaine in exchange for $5,000 up front and $11,000 more within a month. She also told him that the total purchase price of $16,000 included "the sticks [of dynamite]." Green responded, "I ain't, forget the sticks. I'm talking about the powder." He also told Stahl that he did not "wanna keep talking about this thing" because he feared he was under surveillance. The next day, Green told Stahl that he would accept Frankie's terms, and described his plan to sell the cocaine through a friend in Pottstown, Pennsylvania. On July 28, Stahl told Green that Frankie's associates would be up from Florida the following weekend and that Green should have his $5,000 ready. Stahl reminded him that "the sticks are right in with the 11 grand . . . . Take it, book and then you can deal more with him later."

The sale was scheduled for August 3. Green had not pulled together the necessary $5,000, but he brought along $3,100 plus the title to a vehicle he intended to offer as collateral. Stahl picked up Green at his apartment and drove him to a motel, where they met "Mario," an FBI agent posing as Frankie's friend. After initial conversations inside the motel, Mario, Green, and Stahl went to Mario's vehicle. Mario opened the trunk and showed Green one bag containing dynamite and another containing cocaine. Green twice said, "alright," then went to retrieve Stahl's vehicle. As he walked to the car,

5

however, he noticed police officers sitting in several of the vehicles in the parking lot. He decided to abandon the deal. He got into Stahl's car, stopped in front of Mario's car, pulled Stahl into the vehicle, and sped away. As they drove away, Green exclaimed to Stahl that there were police officers ("the man") in the parking lot. Stahl feigned ignorance, but Green angrily accused her of setting him up. He exclaimed: "Look, look. That's the fucking man . . . . bitch I oughta kill your fucking ass." Stahl denied any involvement with the police, but Green was not convinced. He ordered Stahl to stay away from him, drove her car back to his apartment, and dropped himself off. Stahl drove away unharmed.

Green was arrested four days later. He was indicted on one count of attempted possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) and 21 U.S.C. § 846. He was not charged in connection with his attempts to procure dynamite or his threat to kill A.G.

Before trial, the Government filed a motion in limine to admit recorded and testimonial evidence of Green's attempts to purchase dynamite and threats to kill A.G. Specifically, the Government's theory of admissibility was that Green's pursuit of dynamite constituted "intrinsic evidence" concerning the charged cocaine offense. This argument relied on *United States v. Williams*, 900 F.2d 823 (5th Cir. 1990), and similar cases from other courts of appeals. In *Williams*, the Fifth Circuit

6

stated that evidence of uncharged bad acts is "intrinsic" to the charged offense "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *Id.* at 825. The court distinguished such evidence from "extrinsic" evidence, which, unlike intrinsic evidence, must be analyzed under Rule 404(b). *Id.* The Government contended that Green's attempts to buy dynamite were inextricably intertwined with the charged cocaine offense because Green's drug crime "occurred concurrently with and arose out of [his] negotiations for explosives, and because the final price, quantity, and terms of the charged cocaine transaction were inextricably bound up in and influenced by Green's negotiations for explosives."

Green argued for exclusion of all references to the dynamite and why he wanted it. He argued that discussions about dynamite and killing A.G. were not "intrinsic" to the charged cocaine offense, and could easily be redacted from the recordings of his conversations with Stahl about cocaine. He also argued that even if the references to dynamite were intrinsic evidence, they should be excluded under Rule 403.

After a hearing, the District Court granted the Government's motion. The District Judge apparently accepted the Government's "intrinsic evidence" argument, because he did not conduct a Rule 404(b) analysis. He reasoned that "the dynamite explains how we got into a drug deal in the first

7

place," and that "the Government certainly is entitled to give the background [and an] explanation [of] how this all came about, how they ended up together in this position to arrest [Green] under these charges." The District Judge also declined to exclude the Government's evidence under Rule 403. He recognized that the evidence was highly prejudicial, but offered to give a limiting instruction to the jury.

At trial, the jury heard recordings of the conversations between Stahl and Green recounted above. Stahl supplemented those recordings with testimony about the conversations and Green's attempts to procure dynamite and cocaine. She testified that she went to the FBI after she learned that "Green wanted to kill a couple officers and he was looking for . . . some cocaine and dynamite." She also said that she agreed to cooperate with the subsequent investigation because "officers' lives were in danger." Shortly after that testimony, the jury heard the July 7 conversation in which Stahl questioned Green about his desire to "blow up" Gussy. The prosecutor asked who Gussy was. Stahl responded that Gussy was "an officer" and that Green "wanted to know where he lived . . . because . . . you know, he wanted to kill him. He wanted to murder him because he was busted."

Meanwhile, Green attacked Stahl's credibility throughout the trial. In his opening statement, he called her a "profane, aggressive, and unpleasant individual" whose cooperation with the FBI was "motivated by money." He developed this line of

8

attack during his cross-examination of the Government's first witness, FBI Agent Robert Barbieri, who was Stahl's FBI handler. Barbieri testified that the FBI paid Stahl approximately $900 for her work as an informant, both to compensate her for her time and to reimburse her for gas and the use of her cell phone. He acknowledged that Stahl had asked for money from the FBI "five or six times" since the investigation of Green had concluded, and had threatened not to testify against Green unless the FBI gave her more money. He also admitted that Stahl had asked if the FBI could help her son, who was facing state-law criminal charges in an unrelated matter. Green resumed this attack during cross-examination of Stahl herself. He suggested that the $900 she received from the FBI was a lot of money to her, and again suggested that she cooperated to help her son. Stahl denied any improper motive and insisted that she approached the FBI out of a desire to "protect people, lives that [were] in danger."

Near the end of the trial, the District Court reminded the jury that Green was "not on trial for any acts or attempted acts relating to dynamite," and cautioned jurors not to use evidence about dynamite as proof that Green was a bad person with a propensity for committing criminal acts. Green's trial counsel approved this charge, telling the District Court that its proposed instruction was "great." The jury found Green guilty.

In determining Green's offense level for purposes of calculating his advisory Guidelines range, the District Court

applied a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1. Obstructive conduct under § 3C1.1 includes "threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 cmt. n.4(a). Green received this enhancement because he yelled, "bitch I oughta kill your fucking ass" at Stahl as they drove away from the motel. The District Court concluded that this statement amounted to a "threat," inasmuch as Green had menaced Stahl precisely *because* he realized she had set him up, and was likely to be a witness against him in the future.

The Court sentenced Green to 96 months in prison. Green filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).[2]

## II.

In the District Court, Green challenged the admissibility of all evidence concerning his attempts to buy dynamite. He has narrowed his challenge on appeal. He admits that his discussions about dynamite permeated and "could be said to have intertwined" with his discussions about cocaine. Green contends, however, that the District Court erred in allowing evidence that he had threatened to use that dynamite to kill A.G.

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231.

In other words, he no longer argues that the jury should not have learned that he sought to buy dynamite. He argues only that it should not have been allowed to learn *why* he wanted that dynamite. He claims that this evidence was not "intrinsic evidence." Additionally, he argues that evidence of his threat to kill A.G. was inadmissible under Rule 404(b), and in any event should have been excluded under Rule 403.[3]

As it did in the District Court, the Government asserts that evidence of Green's threat to kill A.G. was intrinsic evidence and thus admissible without reference to Rule 404(b). In the alternative, it argues that the evidence was admissible under Rule 404(b), and need not have been excluded under Rule

---

[3] He also claims that the District Court erred by enhancing his offense level pursuant to U.S.S.G. § 3C1.1. He admits that he threatened Stahl, but argues that he did not obstruct justice because his threat was neither "real" nor "credible" and was never carried out. We are not persuaded. *See United States v. Ramey*, 24 F.3d 602, 609 (4th Cir. 1994) (upholding § 3C1.1 enhancement in light of defendant's threats against trial judge, which the defendant claimed were merely "idle" threats, because "[a]s between the threatener and the threatened, we think that the threatener should bear the risk of misunderstanding"), *abrogated on other grounds by Jones v. United States*, 529 U.S. 848 (2000); *United States v. McIntosh*, 23 F.3d 1454, 1459 (8th Cir. 1994) (rejecting argument that § 3C1.1 enhancement was unjustified because defendant's threats against suspected informants were never carried out).

11

403.  As a fallback position, the Government maintains that admission of the evidence was, at worst, harmless error.

"We review the district court's evidentiary rulings principally on an abuse of discretion standard." *Complaint of Consolidation Coal Co.*, 123 F.3d 126, 131 (3d Cir. 1997). An abuse of discretion occurs only where the district court's decision is "arbitrary, fanciful, or clearly unreasonable"—in short, where "no reasonable person would adopt the district court's view." *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009). "We exercise plenary review, however, of [the district court's] rulings to the extent they are based on a legal interpretation of the Federal Rules of Evidence." *Complaint of Consolidation Coal Co.*, 123 F.3d at 131. This includes plenary review "of whether evidence falls within the scope of Rule 404(b)." *United States v. Cruz*, 326 F.3d 392, 394 (3d Cir. 2003).[4]

III.

---

[4] The fact that Green has narrowed his intrinsic evidence argument on appeal does not necessitate plain error review. The argument he advances here—that evidence of his motive for purchasing dynamite should have been excluded—was necessarily included within, and specifically advanced as part of, his broader argument in the District Court for exclusion of all evidence about dynamite.

We begin with Green's argument that evidence of his threat to kill A.G. was not "intrinsic" to the crime charged. In doing so, we examine several evidentiary concepts that have frustrated courts and commentators alike. Accordingly, recourse to some legal history affords useful context.

"The original attitude of the English courts was that any relevant evidence of the defendant's misconduct was admissible even if the only theory of relevance was to establish the defendant's character and, in turn, use character as circumstantial proof of conduct." 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 2:25 (2009) [hereinafter Imwinkelried, *Uncharged Misconduct Evidence*]. Abuse of this rule, among others, by the inquisitors of the Star Chamber prompted Parliament to pass the Treason Act of 1695. *Id.* That law granted several new rights to individuals accused of treason. First, it entitled the accused to a copy of the indictment stating the charges against him. Second, it mandated that any overt act of treason alleged in the indictment be proved by two witnesses, testifying in open court subject to cross-examination. Third, and most importantly for present purposes, it provided that no overt act that was not alleged in the indictment could be proved at trial. *See* Thomas J. Reed, *Trial by Propensity: Admission of Other Criminal Acts Evidenced in Federal Criminal Trials*, 50 U. Cin. L. Rev. 713, 716-17 (1981) [hereinafter Reed, *Trial by Propensity*] (citing 7 Will. III, ch. 3 (1695)). Over time, courts extended the rule against proving uncharged acts to criminal trials generally, not just trials for treason. *Id.* at 717. By 1810,

it was more or less settled that "bad acts evidence which merely demonstrate[d] the propensity of the defendant to do acts similar to those charged" was inadmissible. *See* Norman Krivosha et al., *Relevancy: The Necessary Element in Using Evidence of Other Crimes, Wrongs, or Bad Acts To Convict*, 60 Neb. L. Rev. 657, 664 (1981) (citing the 1810 case of *Rex v. Cole*).[5]

English decisions in this area influenced American courts, and the rule here throughout the 19th and 20th centuries mirrored that of England: evidence that the accused had committed some other crime was not admissible to prove that the defendant had a propensity for committing crimes, and

---

[5] *See also* Imwinkelried, *Uncharged Misconduct Evidence*, *supra*, § 2:26 (explaining that *Cole* "forbade the prosecution only from using the defendant's subjective character as circumstantial proof of the defendant's conduct" with respect to the crime charged); David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 4.3.1 (2009) ("The general ban on evidence of character to prove action in conformity was well-established in Great Britain by 1810."). *But see* Julius Stone, *The Rule of Exclusion of Similar Fact Evidence: England*, 46 Harv. L. Rev. 954, 960-61 (1933) (recounting English courts' treatment of character evidence and arguing that *Cole* announced "a very narrow principle of exclusion" that was not widely followed).

14

therefore probably committed the charged crime.[6]  Reed, *Trial by Propensity*, *supra*, at 736, 739.  *See also* David P. Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events* § 3.3 at 101 (2009) ("American courts plainly followed English practice in excluding [uncharged misconduct] evidence when offered to prove guilt through an inference of bad character.").

It was held early on, however, that this rule did not require the exclusion of *all* evidence of uncharged crimes.[7] Courts allowed such evidence when it was introduced not to demonstrate propensity, but to establish the "res gestae" ("thing

---

[6]  Theories varied for why this should be. Some argued that evidence that the defendant had committed an uncharged crime as proof of criminal propensity was simply irrelevant. The most common view was that such evidence was relevant, but that the risk of unfair prejudice outweighed its usefulness. Others pointed out the unfairness of surprising the defendant and forcing him to defend against uncharged misdeeds—hearkening back to the abuses that brought about the Treason Act of 1695.  *See* Leonard, *supra*, § 1.2 (collecting citations).

[7]  We will sometimes use the term "crimes" as a shorthand for the more accurate, but cumbersome, term "crimes or wrongful acts."  For purposes of this discussion, there is no material difference between criminal and non-criminal bad acts.

done") of the charged crime.[8]  Most of the early cases arose in the state courts.  *Walker v. Commonwealth*, 28 Va. (1 Leigh) 574, 1829 WL 772 (Va. 1829), was one such case, though it did not explicitly invoke the term "res gestae."  In *Walker*, the defendant was indicted for larceny of a watch, a gold chain, and a key.  At trial, the prosecution was permitted to introduce evidence that the defendant had also stolen a cloak, a theft which was the subject of a separate indictment.  *Id.* at *1.  The defendant was convicted and appealed, contending that admission of evidence concerning the stolen cloak was error. The General Court of Virginia agreed.  It began its analysis by acknowledging the general rule that the prosecution was forbidden to "go into proof of the commission of any other

---

[8]  Use of the term "res gestae" in the evidentiary context originated in the law of hearsay.  It developed as one exception to the general rule against hearsay, with the applicable rule being stated as follows: "Whenever any act may be proved, statements accompanying and explaining that act made by or to the person doing it, may be proved if they are necessary to understand it."  James B. Thayer, *Bedingfield's Case – Declarations as a Part of the Res Gesta*, 15 Am. L. Rev. 1, 2 (1881).  *See also* 2 Kenneth S. Broun, *McCormick on Evidence* § 218 (6th ed. 2009) (explaining hearsay origins of res gestae).  The idea was that, with respect to the events at issue in a case, "the conduct and the accompanying words were all part of the same transaction or the 'things done,' and if the conduct was admissible, so were the words."  Chris Blair, *Let's Say Goodbye to Res Gestae*, 33 Tulsa L.J. 349, 350 (1997).

16

offence than that charged or of the character of the prisoner[.]"
*Id*. at *2. It then recognized that

> [i]t frequently happens, however, that as the evidence of circumstances must be resorted to for the purpose of proving the commission of the particular offence charged, the proof of those circumstances involves the proof of other acts, either criminal or apparently innocent. In such cases, it is proper . . . that the chain of evidence should be unbroken. If one or more links of that chain consist of circumstances . . . which tend to prove that the prisoner has been guilty of other crimes than that charged, this is no reason why the court should exclude those circumstances. They are so intimately connected and blended with the main facts adduced in evidence . . . that they cannot be departed from with propriety; and there is no reason why the *criminality* of such intimate and connected circumstances . . . should exclude them, more than other facts apparently innocent.

*Id*. The court gave the following hypothetical: suppose a man is indicted for murder. Suppose further that the murder weapon was a pistol; that this pistol once belonged to another man, but was stolen on the same night the defendant was seen at the rightful owner's house; and that the defendant was seen in possession of the pistol on the day of the murder. This evidence would tend to suggest that the defendant had stolen the pistol. Should it be admitted in the murder trial? The court said yes,

17

even though the evidence tended to prove both larceny and murder, because it was "intimately connected and blended with the main facts" of the charged murder. The court distinguished between evidence which "constitute[d] a part of the transaction"—the sort of evidence that became known as res gestae—and evidence of "circumstances hav[ing] no intimate connexion with the main fact." *Id.* The former was admissible; the latter was not.

Application of similar rules led to a different result in *Commonwealth v. Heath*, 40 Va. (1 Rob.) 735, 1842 WL 2475 (Va. 1842). There, the trial court allowed a witness to testify that the defendant had shot him shortly before he murdered the victim. The General Court upheld that decision, noting that "the fact of the shooting, as being part of the circumstances and of the *res gestae*, ought not to have been precluded from being given in evidence to the jury, although such evidence might itself have tended to prove a distinct felony committed by the prisoner." *Id.* at *5. *Brown v. Commonwealth*, 76 Pa. 319, 1874 WL 13019 (Pa. 1874), was to the same effect. In that case, the defendant was accused of murdering a husband and wife. In a separate trial for the murder of the wife, prosecutors sought to prove that the husband's body had been found nearby. The defendant argued that nothing about the husband's murder should be admitted. The Pennsylvania Supreme Court disagreed. It held that "[b]eing parts of the same *res gestae*," the two murders "together, tend[ed] to throw light on each other, and there is no reason that the truth should be thrown out by

18

excluding" evidence concerning the murder of the husband.  *Id.* at \*16.  This despite the general rule that "the commission of a distinct offense, even similar in character, cannot be given in evidence" against a defendant.  *Id.*

The most famous case on this issue was *People v. Molineaux*, 6 Bedell 264 (N.Y. 1901).  In that case, Molineaux was accused of poisoning and killing one Mrs. Adams.  At trial, the court allowed the prosecution to introduce evidence suggesting that Molineaux had also poisoned a romantic rival with the same drug that felled Mrs. Adams.  *Id.* at 281-84.  The New York Court of Appeals held that this evidence should not have been admitted.  It declared it "universally recognized and . . . firmly established in all English-speaking lands" that "the general rule of evidence applicable to criminal trials is that the state cannot prove against a defendant any crime not alleged in the indictment, either as a foundation for a separate punishment, or as aiding the proofs that he is guilty of the crime charged." *Id.* at 291.  The court recognized that there were exceptions to this rule, however, such as where the evidence tended to prove "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; [or] (5) the identity of the person charged with the commission of the crime on trial."  *Id.* at 293.  In explaining the "common scheme" exception, the court acknowledged that evidence of other crimes could be admissible "where two or more crimes are so connected that it is impossible

19

to distinguish them and proof of all, in the effort to establish one, is a part of the *res gestae*." *Id.* at 308 (citing *Brown*, 76 Pa. 319, and *People v. Foley*, 31 N.W. 94 (Mich. 1887)).

In the decades that followed, federal courts generally adhered to the approach outlined in *Molineaux*. They held that evidence of uncharged misconduct was generally inadmissible, but recognized many exceptions to that rule, including one for evidence that was part of the res gestae. *Gianotos v. United States*, 104 F.2d 929 (9th Cir. 1939), is representative. In that case, Gianotos and two others were charged with unlawfully importing opium. Thomas, a co-defendant who had been caught with the opium, pleaded guilty and agreed to testify for the government. Thomas testified that he agreed to hold the opium only because Gianotos had threatened to inform police that Thomas had assisted him in a separate act of opium smuggling months earlier. *Id.* at 930. On appeal, Gianotos argued that no evidence concerning the earlier smuggling should have been admitted. The Ninth Circuit disagreed. It began by recognizing the general rule against admitting evidence "that the accused has committed another crime wholly independent of that for which he is on trial." *Id.* at 932. The court recognized, however, that there were many exceptions to this rule, including one for instances in which "two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other[.]" *Id.* Applying this exception, the Ninth Circuit held that the challenged evidence was admissible because it explained why Thomas feared Gianotos enough to go along with

20

the charged offense. The court reasoned that "[t]he purpose of this evidence relating to the former crime was not to establish the commission of a *distinct* offense," but the *charged* offense, insofar as it explained Thomas's involvement. *Id.* (emphasis added). It concluded by stating the prevailing rule: "in proving a crime, all the res gestae may always be shown, though it involve proof or evidence concerning the commission of another and independent crime by the defendant at the same time." *Id.* at 933.

Similarly, in *United States v. Tuffanelli*, the Seventh Circuit allowed evidence of uncharged wrongful acts in a conspiracy case involving violations of federal liquor laws, on the theory that those acts were "logically connected" with the charged offense and "so closely and inextricably mixed up with the history of the guilty act itself as to form part of the plan or system of criminal action." 131 F.2d 890, 893 (7th Cir. 1942). In *Bracey v. United States*, the D.C. Circuit synthesized more than a dozen cases and concluded that, notwithstanding the general rule against the admission of uncharged crimes, "evidence of other criminal acts has been held admissible by this court when they are so blended or connected with the one on trial as that proof of one incidentally involves the other; or explains the circumstances thereof; or tends logically to prove any element of the crime charged." 142 F.2d 85, 88 (D.C. Cir. 1944). *See also United States v. Hughes*, 441 F.2d 12, 19-20 (5th Cir. 1971) (upholding admission of evidence that defendants possessed firearms in a trial for counterfeiting

21

because the defendants' guns were part of the res gestae; they "were so closely blended and inextricably bound up with the history of the crime itself as to constitute a part of the plan or system of criminal action involved in the case"); *United States v. Crowe*, 188 F.2d 209, 212 (7th Cir. 1951) (citing *Tuffanelli* and *Gianotos*); *Lynch v. United States*, 12 F.2d 193, 194 (4th Cir. 1926) ("The general rule is that, where a defendant is on trial for one offense, evidence of separate and distinct offenses is not permissible, except where . . . the subject of inquiry is so related to the main offense as to throw material light thereon.").

While use of the res gestae exception grew common, critics argued the term was too vague to be useful and encouraged rote incantation of Latinisms in lieu of thoughtful analysis. Professor Wigmore was especially unsparing. He wrote that res gestae was an "empty phrase [which encouraged] looseness of thinking and uncertainty of decision," 6 John Wigmore, *Wigmore on Evidence* § 1767 (Chadbourn rev. 1976), and "most frequently used as a cover for loose ideas and ignorance of principles," 1A John Wigmore, *Wigmore on Evidence* § 218 (Tillers rev. ed. 1983). Professor Morgan wrote that res gestae was a "troublesome expression" which owed its prominence "to an inclination of judges and lawyers to avoid the toilsome exertion of exact analysis and precise thinking." Edmund Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae*, 31 Yale L.J. 229, 229 (1922). He argued that the phrase was marked by "exasperating indefiniteness" that did "nothing but bewilder and perplex," and

22

faulted courts for choosing to "express[] in a dead and foreign tongue an idea for which there are accurate and adequate English words." *Id.* Professor Thayer likewise criticized the "growing and intolerable vagueness of the expression." James B. Thayer, *Bedingfield's Case – Declarations as a Part of the Res Gesta*, 15 Am. L. Rev. 1, 10 (1881). These criticisms were chiefly directed to the use of res gestae as a hearsay exception, but they were equally applicable to its use in the context of uncharged crimes.[9] *See* Leonard, *supra*, § 5.2 at 322-24.

In 1975, Congress adopted the Federal Rules of Evidence. The new codification included Rule 404(b), which provided that evidence of "other crimes, wrongs, or acts" was inadmissible to prove a person's character in order to show action in conformity therewith, but admissible for "other purposes, such as proof of motive, opportunity, intent,

---

[9] These criticisms live on. *See, e.g.*, *United States v. Hill*, 953 F.2d 452, 457 n.1 (9th Cir. 1991) (cautioning against use of the "overly-broad" res gestae doctrine); *United States v. Krezdorn*, 639 F.2d 1327, 1332 (5th Cir. Unit A Mar. 1981) (describing res gestae as "an appellation that tends merely to obscure the analysis underlying the admissibility of the evidence"); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:33 (3d ed. 2003) (describing res gestae as a "mind-numbing and elastic term" which "pretends much but means little"); Chris Blair, *Let's Say Goodbye to Res Gestae*, 33 Tulsa L. J. 349 (1997) (arguing that Oklahoma courts should abandon the term).

23

preparation, plan, knowledge, identity, or absence of mistake or accident." The rule codified the common law bar against the use of uncharged crimes to prove criminal propensity—albeit in a modified form. The common law rule was widely, though not universally, stated in "exclusionary" terms. That is, it set forth a general rule of inadmissibility, subject to exceptions, such as res gestae. *See, e.g.*, *United States v. Clemons*, 503 F.2d 486, 489 (8th Cir. 1974) (describing "narrow exceptions to [a] general rule of exclusion"); *Molineaux*, 6 Bedell at 293. By contrast, Rule 404(b) was "inclusionary." It stated a general rule of admissibility, subject to a single exception—evidence of other wrongful acts was admissible so long as it was not introduced *solely* to prove criminal propensity. Thus, the proponent no longer had to pigeonhole his evidence into one of the established common-law exceptions, on pain of exclusion. If he could identify *any* non-propensity purpose for introducing the evidence, it was admissible.[10] *See, e.g.*, *United States v.*

---

[10] A minority of courts, including this Court, adhered to an inclusionary rule even before Rule 404(b) was adopted. *See United States v. Stirone*, 262 F.2d 571, 576 (3d Cir. 1958) (adopting the inclusionary statement of the rule against other crimes evidence), *rev'd on other grounds*, *Stirone v. United States*, 361 U.S. 212 (1960). *See also* Thomas J. Reed, *The Development of the Propensity Rule in Federal Criminal Causes 1840-1975*, 51 U. Cin. L. Rev. 299, 303-04 (1982) (explaining that the Second and Tenth Circuits also took the inclusionary view before Rule 404(b) was adopted).

*Long*, 574 F.2d 761, 765-66 (3d Cir. 1976) (contrasting the exclusionary and inclusionary approaches); *United States v. Bradwell*, 388 F.2d 619, 621-22 (2d Cir. 1968) (same); Leonard, *supra*, § 4.3; Reed, *Trial by Propensity*, *supra*, at 728-30.

Since Rule 404(b) was enacted, the term "res gestae" has largely given way to its "modern, de-Latinized" descendant: "intrinsic evidence," the term invoked by the Government in this case.[11] *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:33 (3d ed. 2003). *See also* Edward J. Imwinkelried, *The Second Coming of Res Gestae*, 50 Cath. U. L. Rev. 719, 728 (2010) [hereinafter Imwinkelried, *The Second Coming of Res Gestae*] (describing the inextricably intertwined doctrine as "arguably the second coming of the common-law *res gestae* principle"). As mentioned earlier, modern cases divide evidence of other crimes and bad acts into two categories: those "extrinsic" to the charged offense, and those "intrinsic" to it. Extrinsic evidence must be analyzed under Rule 404(b); intrinsic evidence need not be. Recalling the logic for allowing res gestae evidence, courts today exempt intrinsic evidence from application of Rule 404(b) on the theory that there is no "other" wrongful conduct at issue; the evidence is admissible as part and parcel of the charged offense. *Compare Gianotos*, 104 F.2d at 932 (res gestae evidence admissible "not to establish the

---

[11] The term "res gestae" is still incanted by courts from time to time. *See, e.g.*, *United States v. Till*, 434 F.3d 880, 884 (6th Cir. 2006).

25

commission of a distinct offense . . . . but for its bearing on the crime under investigation"), *with United States v. Gibbs*, 190 F.3d 188, 217-18 (3d Cir. 1999) (intrinsic evidence is not subject to Rule 404(b) analysis because there is no "other" crime). The distinction between intrinsic and extrinsic evidence has been criticized, *see, e.g.*, *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002); *United States v. Bowie*, 232 F.3d 923, 927 (D.C. Cir. 2000), but it is one we have accepted, *see, e.g.*, *United States v. Hoffecker*, 530 F.3d 137, 189 (3d Cir. 2008); *Gibbs*, 190 F.3d at 217.

This brings us to the issue presented in this appeal. Was evidence of Green's threat to kill A.G. "intrinsic" to the charged offense of attempted possession of cocaine with intent to distribute? The answer to that question depends on the definition of "intrinsic evidence," a term we have used before but never conclusively defined. Exhuming the "inseparably connected" and "inextricably mixed up" language of res gestae,[12] most courts of appeals today hold that acts are "intrinsic" to the charged offense if they are "inextricably intertwined" with that offense. *Cross*, 308 F.3d at 320. They allow this evidence for the same reason courts once allowed res gestae evidence: it helps the factfinder to "evaluate all of the circumstances under which the defendant acted." *United States v. Smith*, 930 F.2d 1081, 1087 (5th Cir. 1991). In other words,

---

[12] *See Gianotos*, 104 F.2d at 932; *Tuffanelli*, 131 F.2d at 893.

it aids understanding by "complet[ing] the story" of the charged crime. *See, e.g.*, *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009); *United States v. Sumlin*, 489 F.3d 683, 687 (5th Cir. 2007); *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000).

Courts following this reasoning employ a variety of tests for determining whether an act is "inextricably intertwined" with the charged offense. The Eleventh Circuit holds that evidence is inextricably intertwined if it is "not part of the crime charged but pertain[s] to the chain of events explaining the context" of the crime; or is "linked in time and circumstances with the charged crime"; or "forms an integral and natural part of an account of the crime"; or "complete[s] the story of the crime for the jury." *United States v. Wright*, 392 F.3d 1269, 1276 (11th Cir. 2004). The Seventh Circuit exempts from Rule 404(b) evidence of misconduct that supplies "a complete story of the crime on trial"; evidence necessary to avoid "a chronological or conceptual void in the story of the crime"; and evidence that is "so blended or connected that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime." *United States v. Gibson*, 170 F.3d 673, 681 (7th Cir. 1999) (internal quotations omitted). The Eighth Circuit considers evidence inextricably intertwined if it is "an integral part of the immediate context of the crime charged." *United States v. Hall*, 604 F.3d 539, 543 (8th Cir. 2010). The Second Circuit inquires whether the uncharged crime evidence is "necessary to complete the story of the crime on trial." *United*

27

*States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (internal citations and quotations omitted). The Tenth Circuit asks whether a witness's testimony "would have been confusing and incomplete without mention of the [uncharged] act." *United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir. 1994).

There are at least three problems with the "inextricably intertwined" test and its subsidiary formulations. The first is that the test creates confusion because, quite simply, no one knows what it means. Such an impediment stands as an obstacle to helpful analysis. Indeed, we have criticized the "inextricably intertwined" standard as "a definition that elucidates little." *Cross*, 308 F.3d at 320. The Seventh Circuit, which has consistently used the test, admits that it is often "unhelpfully vague." *United States v. Taylor*, 522 F.3d 731, 734 (7th Cir. 2008).[13] Professors Mueller and Kirkpatrick argue that it "has proved elastic and invites abuse." 1 Mueller & Kirkpatrick, *supra*, § 4:33. Others note that it "substitutes a careful analysis with boilerplate jargon," 1-404 Stephen A. Saltzburg et al., *Federal Rules of Evidence Manual* § 404.02[12] (9th ed.), and "invites sloppy, non-analytical decision-making," Leonard, *supra*, § 5.2 at 327. Even Professor Imwinkelried, who defends

---

[13] *See also United States v. Conner*, 583 F.3d 1011, 1018-21 (7th Cir. 2009) (crediting several criticisms of the inextricably intertwined test and holding that the district court abused its discretion by admitting evidence pursuant to the doctrine).

28

the test, concedes that the "vacuous nature of [its] wording gives courts license to employ sloppy analysis and allows them quickly to slip from a conclusory analysis to a desired conclusion." Imwinkelried, *The Second Coming of Res Gestae*, *supra*, at 729-30.

Indeed, this case exemplifies how elusive and unhelpful the "inextricably intertwined" standard can be. All of the formulations used by the courts of appeals purport to embody the same test, but clearly they are not interchangeable. Whether evidence qualifies as intrinsic in a particular case may well depend on which version of the test one employs. For example, Green's threat to kill A.G. would qualify as intrinsic if the test is whether it "pertain[s] to the chain of events explaining the context" of the crime, *Wright*, 392 F.3d at 1276, because it "pertained to" (in fact, triggered) Stahl's decision to go to the FBI and the subsequent chain of events through which Green was caught attempting to possess cocaine. The same threat would not be intrinsic, however, if the test were whether that threat was "an integral part of the immediate context of the crime charged." *Hall*, 604 F.3d at 543. The District Court just as easily could have forced the Government to start the tale of Green's wrongdoing with the fact that Stahl went to the FBI because Green had expressed interest in buying cocaine and dynamite. It was not strictly necessary for the jury to know *why* Green wanted dynamite in order for it to understand that he did, and that his inquiries on that point drove Stahl to the FBI. Likewise, Green's threat to kill A.G. would probably be intrinsic

29

evidence if the touchstone were whether that threat "explain[ed] the circumstances surrounding" Stahl's decision to warn the FBI. *Gibson*, 170 F.3d at 681. It would not be intrinsic, however, if the relevant inquiry is whether Stahl's testimony "would have been confusing and incomplete without mention" of the threat against A.G. *Johnson*, 42 F.3d at 1316. We see no principled way to choose among these competing incarnations of the test, yet that choice could well be determinative. "Simply stated, the indefinite phrasing of the doctrine is a virtual invitation for abuse." Imwinkelried, *The Second Coming of Res Gestae*, *supra*, at 730.

The second problem with the inextricably intertwined test is that resort to it is unnecessary. The most common justification for admitting evidence of "intertwined" acts is to allow a witness to testify freely and coherently; we do not want him to have to tiptoe around uncharged bad acts by the defendant, and thereby risk distorting his narrative. This is a worthy goal, but it can be accomplished without circumventing Rule 404(b). As the D.C. Circuit explained in *Bowie*:

> If the so-called "intrinsic" act is indeed part of the crime charged, evidence of it will, by definition, always satisfy Rule 404(b). The rule bars bad acts evidence only when the evidence is offered solely to "prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b). Evidence that constitutes the very crime being prosecuted is not of that sort.

30

232 F.3d at 927. There is little practical difference between admitting inextricably intertwined evidence as "background" pursuant to Rules 401 and 402, and admitting it under Rule 404(b). In both cases, the evidence must be relevant, it must pass muster under Rule 403, and it must not be introduced solely to prove the defendant's criminal propensity. "[T]he only consequences of labeling evidence 'intrinsic' are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request." *Id.  See also United States v. Ameri*, 297 F. Supp. 2d 1168, 1173 (E.D. Ark. 2004) ("It is difficult for me to conjure up a fact situation where 'inextricably intertwined' evidence wouldn't be admissible under Rule 404(b). If this is true, why discard the Rule 404(b) safeguards? . . . . [T]he notice requirement of 404(b) is manifestly important, and is often crucial if the Defendant is to meet the 'bad act' evidence."). Stated another way, the "inextricably intertwined" doctrine exempts evidence of wrongful acts that explain the circumstances of the crime from the rigors of Rule 404(b). But the same evidence would also be admissible *within the framework* of that rule because allowing the jury to understand the circumstances surrounding the charged crime—completing the story—is a proper, non-propensity purpose under Rule 404(b). *See, e.g.*, *United States v. O'Leary*, 739 F.2d 135, 136 (3d Cir. 1984) (identifying the need "to show the background of the charges [and] the parties' familiarity with each other" as a proper purpose); *United States v. Simmons*, 679 F.2d 1042, 1050 (3d Cir. 1982) (concluding that providing the jury with

31

"necessary background information" was a proper purpose under Rule 404(b)); *United States v. Dansker*, 537 F.2d 40, 58 (3d Cir. 1976) (upholding introduction of prior criminal acts by defendants because "the background information provided by this testimony enabled the jury to better understand [the witness's] role in the bribery scheme as well as his testimony as a whole").[14]  All that is accomplished by labeling evidence "intrinsic" is relieving the Government from providing a defendant with the procedural protections of Rule 404(b).

The third problem with the inextricably intertwined test is that some of its broader formulations, taken at face value, classify evidence of virtually any bad act as intrinsic. *See, e.g.*, *Gibson*, 170 F.3d at 681 (permitting evidence of any act that "explains the circumstances surrounding . . . the charged crime").  As we warned in *Cross*, such a regime would eviscerate Rule 404(b).  *See* 308 F.3d at 320.  *See also Bowie*, 232 F.3d at 929; *Ameri*, 297 F. Supp. 2d at 1169 (explaining that a "liberal view of the 'inextricably intertwined' exception to Rule 404(b) would essentially nullify the 404(b) restrictions on 'bad act' evidence").

---

[14] *See also Taylor*, 522 F.3d at 736 (describing the need to avoid juror confusion as a proper purpose); *United States v. Masters*, 622 F.2d 83, 86-88 (4th Cir. 1980) (explaining that the need to "complete the story" of the crime for the factfinder is a proper purpose under Rule 404(b)); 1 Kenneth S. Broun, *McCormick on Evidence* § 190 (6th ed. 2009) (same).

This Court has never adopted its own version of the "inextricably intertwined" test. In *Cross*, we noted some of the problems with the test but ultimately reserved judgment. We observed that "the distinction between intrinsic and extrinsic . . . . evidence is often fuzzy" and noted that "most circuit courts view evidence as intrinsic if it is 'inextricably intertwined' with the charged offense . . . or if it 'completes the story' of the charged offense." *Cross*, 308 F.3d at 320. We pointed out that the former approach was "a definition that elucidates little," and the latter "so broad that it renders Rule 404(b) meaningless." *Id.* However, we found it unnecessary to go beyond highlighting these "pedagogical problems with understanding intrinsic evidence." Because *Cross* arose from a criminal conspiracy charge, the intrinsic/extrinsic issue was easy to resolve. We noted that, under Third Circuit precedent, "acts are intrinsic when they directly prove the charged conspiracy." *Id.* (citing *Gibbs*, 190 F.3d at 217-18). We concluded that because the evidence at issue did not directly prove the charged conspiracy, it was not intrinsic. *Id.* Accordingly, we declined to decide the boundaries of intrinsic evidence for every case. Specifically, we expressed "no view on whether 'other acts' evidence that does not directly prove an element of the charged offense may be 'intrinsic' . . . if [it is] 'inextricably intertwined' with the events underlying the charge, so that the evidence is necessary for the jury to understand how the offense occurred or to comprehend crucial testimony." *Id.* at 320 n.19.

Our resistance to the "inextricably intertwined" standard

has not diminished since *Cross*, and today we make clear that this is not our test for intrinsic evidence. Like its predecessor res gestae, the inextricably intertwined test is vague, overbroad, and prone to abuse, and we cannot ignore the danger it poses to the vitality of Rule 404(b).

That is not to say we reject the concept of intrinsic evidence entirely. Instead, we will reserve the "intrinsic" label for two narrow categories of evidence. First, evidence is intrinsic if it "directly proves" the charged offense. *See e.g.*, *Cross*, 308 F.3d at 320; *Gibbs*, 190 F.3d at 218 (acts of violence admissible as direct proof of the charged drug conspiracy). *See also Bowie*, 232 F.3d at 929 (acknowledging that evidence of "an act that is part of the charged offense . . . is properly considered intrinsic"). This gives effect to Rule 404(b)'s applicability only to evidence of "*other* crimes, wrongs, or acts." Fed. R. Evid. 404(b) (emphasis added). If uncharged misconduct directly proves the charged offense, it is not evidence of some "other" crime. *Gibbs*, 190 F.3d at 218. Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." *Bowie*, 232 F.3d at 929. But all else must be analyzed under Rule 404(b).

As a practical matter, it is unlikely that our holding will exclude much, if any, evidence that is currently admissible as background or "completes the story" evidence under the inextricably intertwined test. We reiterate that the purpose of

34

Rule 404(b) is "simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence." *Taylor*, 522 F.3d at 735-36. "*No other use* of prior crimes or other bad acts is forbidden by the rule," and one proper use of such evidence "is the need to avoid confusing the jury." *Id.* at 736 (emphasis added). *See also Simmons*, 679 F.2d at 1050 (recognizing that other crimes evidence may be admissible if offered for *any* non-propensity purpose, and identifying the need "to provide necessary background information" about the relationships among the players as a proper purpose). Thus, most, if not all, other crimes evidence currently admitted outside the framework of Rule 404(b) as "background" evidence will remain admissible under the approach we adopt today.[15] The only difference is that the proponent will have to provide notice of his intention to use the evidence, and identify the specific, non-propensity purpose for which he seeks to introduce it (*i.e.*, allowing the jury to hear the full story of the crime). *See Bowie*, 232 F.3d at 927. Additionally, the trial court will be required to give a limiting instruction upon request. *See United States v. Kemp*, 500 F.3d 257, 296 (3d Cir. 2007); *Bowie*, 232 F.3d at

---

[15] Of course, the fact that evidence is admissible for some purpose does not necessarily mean that it should be admitted. As always, district courts must exclude evidence under Rule 403 where its clarifying value as "background" may be substantially outweighed by the risk of unfair prejudice.

35

927-28 (explaining that designation of evidence as "inextricably intertwined" unduly deprives the defendant of the right to a limiting instruction).

Applying the standards set forth above, this is a straightforward case. Evidence of Green's threat to kill A.G. with dynamite was not intrinsic evidence. First, it did not directly prove that Green attempted to possess cocaine with intent to distribute. Additionally, it did not in any meaningful way facilitate his attempt to procure cocaine through "Frankie" and "Mario"—the only crime with which he was charged.

Mindful that we may affirm for any reason supported by the record, however, we turn to the government's alternative argument that evidence of Green's threat to kill A.G. was admissible under Rule 404(b).

IV.

To be admissible under Rule 404(b), evidence of uncharged crimes or wrongs must (1) have a proper evidentiary purpose; (2) be relevant; (3) satisfy Rule 403; and (4) be accompanied by a limiting instruction (where requested) about the purpose for which the jury may consider it. *United States v. Butch*, 256 F.3d 171, 175 (3d Cir. 2001). As explained above, the District Court gave a limiting instruction that Green explicitly approved. We conclude that the remaining requirements were met as well.

36

First, the evidence served at least two proper purposes. A proper purpose is one that is "probative of a material issue other than character." *Huddleston v. United States*, 485 U.S. 681, 686 (1988). The evidence must fit "into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the crime charged." *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994). As explained in the previous section, one proper purpose under Rule 404(b) is supplying helpful background information to the finder of fact. *Simmons*, 679 F.2d at 1050. Here, evidence of Green's threat was admissible as background information which completed the story of the crime. It explained why Green was under investigation, why Stahl agreed to serve as an informant, and the references to A.G. in their conversations. *See id.*; *O'Leary*, 739 F.2d at 136; *Dansker*, 537 F.2d at 58.

Evidence that Green threatened to kill A.G. was also admissible proof of motive. Fed. R. Evid. 404(b). "Motive" is "[s]omething . . . that leads one to act." *Black's Law Dictionary* at 1039 (8th ed. 2004). Here, Green put Stahl's motives for cooperating with the FBI squarely at issue during the trial. Both in his opening statement and on cross-examination, he vigorously suggested that Stahl cooperated with the investigation in order to make money, or to get the FBI to help her son with his criminal charges. In light of that attack, the Government was entitled to produce evidence of an alternative motive for her cooperation—namely, her concern that "officers' lives were in danger"—which it hoped would improve her

37

credibility with the jury, especially in light of her testimony that three of her brothers were either active or retired state troopers.[16] *See United States v. Scarfo*, 850 F.2d 1015, 1021 (3d Cir. 1988) (upholding district court decision to allow other crimes evidence which helped the jury "evaluate the witnesses' motives for cooperating with the government"). We recognize that in the ordinary case the requisite "proper purpose" explains something about the *defendant's* motive, plan, or knowledge. This case is unusual in that the proper purpose we have identified relates to a witness's motive, not the defendant's. While this may be uncommon, it is appropriate. Rule 404(b) provides that evidence of other crimes is inadmissible to prove the character of "a person," but may be admissible as proof of that person's "motive, opportunity, intent," etc. It does not specify that evidence is only admissible to prove *the defendant's* motive, opportunity, or intent. *See, e.g.*, *Scarfo*, 850 F.2d at 1021; Imwinkelried, *Uncharged Misconduct Evidence*, *supra*, § 6:12 (noting that other crimes evidence may be admissible "to explain the conduct of the police, . . . the victim, an informer, a government witness, or the defendant"). In this case, the fact

---

[16] Or, to skip a step in the analysis, the required proper purpose was the rehabilitation of Stahl's credibility, in light of Green's suggestions that she was motivated by money and cooperated solely for selfish reasons. *See United States v. Jemal*, 26 F.3d 1267, 1272 (3d Cir. 1994) (noting that the list of permissible purposes provided in the text of Rule 404(b) is not exhaustive).

that evidence of Green's threat helped to explain Stahl's motives for acting as an informant was sufficient to satisfy Rule 404(b).[17]

Second, evidence that Green threatened to kill A.G. was relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. This definition is "very broad." *Gibson v. Mayor & Council of Wilmington*, 355 F.3d 215, 232 (3d Cir. 2004). "Proof of bias is almost always relevant," *United States v. Werme*, 939 F.2d 108, 114 (3d Cir. 1991), because a "showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel*, 469 U.S. 45, 49 (1984). *See also Schledwitz v. United States*, 169 F.3d 1003, 1015 (6th Cir. 1999) ("[b]ias is always relevant in assessing"

---

[17] Green's only argument against admissibility under Rule 404(b) is that evidence of his threat to kill A.G. could not have been admitted under Rule 404(b) because his motive for buying dynamite (retribution) was entirely unrelated to his motive for the charged cocaine offense (making money). Even if true, the point is irrelevant. As we have explained, Rule 404(b) does not require that the evidence at issue help explain *the defendant's* motives, only the motive of some person whose motive is relevant.

39

credibility).

If proof of bias is almost always relevant, so too is evidence of a lack of bias. *United States v. Fusco*, 748 F.2d 996, 998 (5th Cir. 1984) ("Because evidence of bias *or lack of bias* is substantive, rather than collateral, it may be developed on direct . . . [or] cross-examination, just like any other substantive evidence") (emphasis added). Recognition of the value of such evidence settles the relevance issue here. Green attacked Stahl as less than credible because she was biased in favor of the Government. *See United States v. Sumlin*, 271 F.3d 274, 282 (D.C. Cir. 2001) (explaining that an accusation of bias "is an acceptable method of attacking a witness'[s] credibility"). Therefore, evidence that Stahl cooperated not for the purpose of obtaining favors from the Government, but because A.G.'s life was in danger, was relevant. It provided an explanation for her cooperation that, if believed, increased her credibility relative to what it would have been if Green's attacks had gone unanswered, and thus made the facts to which she testified "more probable . . . .[than they would have been] without the evidence." Fed. R. Evid. 401. *See also United States v. Porter*, 881 F.2d 878, 886 (10th Cir. 1989) (because the government witness's "credibility had been placed in issue by the defense," evidence corroborating that witness's testimony was "relevant for the purpose of overcoming that attack"). Indeed, evidence concerning a witness's credibility is always relevant, because credibility is always at issue, *see United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 666 (3d Cir. 2000) (en

banc) (noting that "[j]urors are instructed, . . . in almost all cases, that they are to determine the credibility of all witnesses who testify . . . . even in the absence of an affirmative challenge to witness credibility"), especially when the witness is testifying for the government in a criminal trial. *United States v. Gambino*, 926 F.2d 1355, 1363 (3d Cir. 1991) (recognizing that, "[i]n any criminal trial, the credibility of the prosecution's witnesses is central").

Third, and contrary to Green's argument on appeal, the District Court was not required to exclude evidence of Green's threat under Rule 403. That rule permits a trial judge to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. We review for abuse of discretion, which means we must uphold the District Court unless its ruling was "arbitrary or irrational." *Universal Rehab. Servs.*, 205 F.3d at 665.

We find no abuse of discretion here. The evidence at issue carried some probative value. It helped explain why talk of dynamite permeated Green and Stahl's taped conversations about cocaine, and why Stahl was working with the FBI. Meanwhile, the risk of unfair prejudice, while certainly present given the deplorable nature of Green's threat, was not so great as to require reversal. We note that we have rejected Rule 403 challenges to the admission of evidence that was just as prejudicial as the evidence at issue here. *See, e.g., Scarfo*, 850 F.2d at 1020 (evidence of uncharged murders); *United States v.*

41

*Sriyuth*, 98 F.3d 739, 748 (3d Cir. 1996) (evidence of uncharged rape).  Furthermore, any risk of unfair prejudice was minimized by the District Court's limiting instruction, which carefully circumscribed the purpose for which the jury could consider the evidence pertaining to dynamite.  *See Sriyuth*, 98 F.3d at 748 (trusting the jury to "compartmentalize the evidence and consider it for its proper purposes" in light of trial court's limiting instruction).

For these reasons, we hold that the challenged evidence was admissible under Rule 404(b).  As a result, we need not decide whether its admission was harmless error.

V.

Evidence of Green's threat to murder A.G. was not intrinsic evidence. It was, however, admissible under Rule 404(b).  The District Court did not err by admitting it at trial. We will affirm the judgment.