**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. EUGENE DARRYL TEMKIN, *Defendant-Appellant*. | No. 12-50103 D.C. No. 2:10-cr-00813-SVW-1 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellant*, v. EUGENE DARRYL TEMKIN, *Defendant-Appellee*. | No. 12-50136 D.C. No. 2:10-cr-00813-SVW-1 OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
December 11, 2014—Pasadena, California

Filed August 13, 2015

Before: Kim McLane Wardlaw and Marsha S. Berzon, Circuit Judges, and William E. Smith, Chief District Judge.[*]

Opinion by Judge Wardlaw

---

## SUMMARY[**]

---

### Criminal Law

The panel affirmed convictions for solicitation to commit a crime of violence, attempted extortion in violation of the Hobbs Act, and use of interstate commerce facilities in the commission of murder-for-hire; vacated the sentence; and remanded for resentencing.

The panel held that sufficient evidence supported the defendant's convictions and the district court's rejection of the entrapment defense.

On the government's cross-appeal, the panel held that in applying the Sentencing Guidelines to the defendant's conviction under 18 U.S.C. § 1958 for use of interstate commerce facilities in the commission of murder-for-hire, the district court erred by using the base offense level of 32 set forth in U.S.S.G. § 2E1.4(a)(1) rather than the cross-

---

[*] The Honorable William E. Smith, Chief District Judge for the U.S. District Court for the District of Rhode Island, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

referencing provision in U.S.S.G. § 2E1.4(a)(2), where the unlawful conduct underlying that conviction was solicitation to commit murder, which, under U.S.S.G. § 2A1.5, yields an offense level (33) that is greater than 32. With a 4-level increase for the "offer or receipt of anything of pecuniary value for undertaking the murder," U.S.S.G. §§ 2A1.5(a), (b)(1), the panel concluded that the defendant's offense level was 37, and that the district court therefore erred in using an offense level of 32 to calculate the defendant's Guidelines range. The panel held that this error was not harmless.

## COUNSEL

Michael Clough (argued), Oakland, California, for Defendant-Appellant/Cross-Appellee.

Mark R. Yohalem (argued), Elizabeth R. Yang and E. Martin Estrada, Assistant United States Attorneys; Robert E. Dugdale, Chief Assistant United States Attorney; André Birotte Jr., United States Attorney, Los Angeles, California, for Plaintiff-Appellee/Cross-Appellant.

**OPINION**

WARDLAW, Circuit Judge:

Eugene Darryl Temkin challenges the sufficiency of the evidence underlying his three counts of conviction for (1) solicitation to commit a crime of violence; (2) attempted extortion in violation of the Hobbs Act; and (3) use of interstate commerce facilities in the commission of murder-for-hire.  Temkin also raises the defense of entrapment.  While we conclude that sufficient evidence supports Temkin's convictions and that Temkin was not entrapped, we agree with the Government that the district court materially erred in calculating the correct base offense level at sentencing.  Accordingly, we affirm Temkin's conviction but vacate his sentence and remand for resentencing.

## I.  Factual and Procedural Background

This dark tale arises from a failed gambling venture in Equatorial Guinea, which was formed by two former drug trafficking associates, defendant Temkin, and his associate of more than twenty years, Michael Hershman.  In 2000, Temkin mortgaged property to loan Hershman and another partner $500,000 as his stake in the gambling venture. When the venture failed in 2003, everyone lost their money, but Temkin also ultimately lost his mortgaged property.  Temkin began demanding repayment of the loan, and became dissatisfied when Hershman sent him only about $1,000 a week.  In 2004, Temkin began a campaign of harassment and threats against Hershman to get his money back.  Although Hershman ultimately returned the money through the settlement of a lawsuit in 2006, Temkin escalated his

demands for the ever-increasing amounts of money he believed Hershman still owed him, bombarding Hershman with harassing and threatening phone calls and emails. Temkin next began "acting out" his obsession with getting even more money from Hershman. He broke into and emptied a Hershman family storage unit containing family possessions and financial documents, and tracked down Hershman's hospitalized daughter by pretending to be her uncle. Temkin hacked into Hershman's email account and computer, tracked his whereabouts in foreign countries, and personally threatened Hershman, at one point brandishing a .45-caliber gun at him.

Then Temkin got serious. He attempted to recruit associates to assist in extorting and murdering Hershman. In around 2006, Temkin suggested to Larry Morrison, a computer-savvy drug dealer who had helped hack Hershman's computer to track him down in Belgium, that he poison Hershman. Having researched options to kill Hershman by poison, Morrison suggested instead that they use a poison that had an antidote—they could poison Hershman, extort his money, and then let him live; a proposition Temkin rejected out of hand. Before they could proceed on this course, Morrison was arrested for drug trafficking.

Temkin then turned to John Malpezzi, a former attorney convicted of drug trafficking, offering him money to kill Hershman. Malpezzi visited Hershman at his Dominican Republic gaming operation, and warned him of Temkin's extortion/murder plan. Malpezzi and Hershman turned to an attorney for advice; the attorney advised Malpezzi to begin recording his conversations with Temkin. Malpezzi took the recordings to Los Angeles Sheriff's Department detectives

who asked him to introduce Temkin to "Chet," an undercover sheriff's detective who would pose as a hitman.

On November 21, 2009, Malpezzi and Chet met with Temkin. Temkin had given "a great deal of thought" to killing Hershman, and he and Chet continued to meet over the next few months to work out a plan. Temkin proposed pushing Hershman off a boat hundreds of miles from shore or staging a "suicide." At one point, Temkin also instructed Chet to rape Hershman's wife and daughter, while Hershman and his son watched, in order to extort more money from Hershman.

The Sheriff's Department apprised the FBI of the situation in December of 2009. The Sheriff's Department indicated that Temkin had given Chet everything that a hitman would need except money, but they did not have enough to file charges without the exchange of money. Therefore, in March of 2010, the Sheriff's Department and the FBI decided to "burn" the investigation by warning Temkin that they were aware of his interactions with a known hitman. Law enforcement informed Temkin that he was being watched and instructed him to leave Hershman and Hershman's family alone.

In May 2010, after Temkin showed signs that he did not intend to follow these instructions, an undercover FBI agent, posing as a different hitman named "Pavel," contacted Temkin. During the initial call, Temkin indicated that he may have secured the "services" of someone else, so Pavel agreed to call Temkin back in one week. On July 7, 2010, Pavel called Temkin and stated, "I understand that you may need my services after all." Temkin responded, "Well strangely enough, yes." Meeting the next day, July 8th, 2010, Temkin

told Pavel to "very strongly persuade [Hershman and his business partner] to move the money from the Colombian account into my Montevideo account." Temkin indicated that Pavel should force Hershman to transfer $15 million into Temkin's bank account. Temkin gave Pavel an address for Hershman's apartment in Spain, information about a bank account through which Pavel could transfer the money to Temkin, and copies of the intended victims' passports. Temkin also instructed Pavel that he wanted Hershman, Hershman's wife, and Hershman's business partner to "go for a very long boat ride. Yes. Out to sea." Temkin gave Pavel $3,000 in cash to cover expenses, noting "[t]hat's as much as I can move." At the end of the meeting, Pavel said to Temkin, "I walk out [of] here, the job is done. They're not going to come back from the trip. It's all done. You understand that?" Temkin responded, "I understand that."

After their July 8th meeting, Temkin left two voicemail messages for Pavel. In the first, left on the evening of July 8th, Temkin stated that "there is some strong interest" in him from law enforcement, and therefore they "might have to rethink." In a second message left on the morning of July 9th, Temkin indicated, using coded language, that another plan "may work equally as well." The calls went unreturned, and Temkin was arrested on July 14, 2010.

Following a bench trial, Temkin was convicted of three counts: (1) solicitation to commit a crime of violence under 18 U.S.C. § 373(a); (2) attempt to interfere with commerce by threats and violence under 18 U.S.C. § 1951(a); and (3) the use of interstate commerce facilities in the commission of murder-for-hire under 18 U.S.C. § 1958(a) ("murder-for-hire"). The district court sentenced Temkin to six years of imprisonment and three years of supervised release. In this

timely appeal, Temkin challenges the sufficiency of the evidence for all three counts and argues that he was entrapped. In a cross-appeal, the Government challenges the sentence imposed by the district court as both procedurally and substantively unreasonable.

## II. Jurisdiction and Standard of Review

We have jurisdiction to review Temkin's conviction and sentence under 18 U.S.C. § 3742(b) and 28 U.S.C. § 1291. Following a bench trial, a district court's conclusions of law are reviewed de novo and findings of fact are reviewed for clear error. *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011). In reviewing a district court's judgment in a bench trial, sufficient evidence supports a conviction if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see United States v. Magallon-Jimenez*, 219 F.3d 1109, 1112 (9th Cir. 2000). "We review a district court's construction and interpretation of the United States Sentencing Guidelines Manual ('Guidelines') de novo and its application of the Guidelines to the facts for abuse of discretion." *United States v. Popov*, 742 F.3d 911, 914 (9th Cir. 2014).

## III. Conviction

### A. Solicitation of a Crime of Violence

Under Count 1, Temkin was convicted of solicitation to commit a crime of violence, namely murder-for-hire. Temkin argues that there was insufficient evidence to establish that he

"actually intended that Pavel kill Hershman." Temkin first argues that he created a condition precedent at his July 8, 2010 meeting with Pavel. Temkin asserts he knew that this condition precedent would never be satisfied, and thus there was insufficient evidence of his intent to go through with the murder. Second, Temkin argues that even if there were sufficient evidence to establish a plan to kill Hershman, he later abandoned that plan in his July 8th and 9th voicemails for Pavel. The district court rejected both arguments, finding that "[a]t the July 8th meeting, the defendant just reached a boiling point and crossed the line." The district court found that during that meeting "the defendant knowingly solicited, commanded, induced or otherwise persuaded another to travel in interstate or foreign commerce to commit murder for hire." Sufficient evidence supports the district court's findings and verdict.

### 1. Condition Precedent

At the outset of the July 8, 2010 meeting, Temkin stated that he planned to check with a "relative who's ex-FBI" that evening to determine the FBI's "level of interest" in him. Temkin characterizes this statement as creating "a condition precedent that he knew would never be satisfied." However, as the district court correctly reasoned, the remainder of the meeting and Temkin's subsequent voicemails confirm that Temkin and Pavel reached a concrete deal during this meeting.

Immediately after Temkin said he planned to check with his ex-FBI relative, Pavel said he normally does one meeting only and then "get[s] it done" with a "success rate [of] 100%." To this, Temkin responded: "Perfect. Well, I need it done." Temkin did not express any contingencies or

reservations. While he did express a desire to check with his ex-FBI relative, his statement to that effect could be understood as indicating that he planned to do so as a precaution meant to avoid detection by law enforcement. Then, during the meeting, Temkin provided Pavel with an address for Hershman's Southern Spain apartment, information about a bank account for transferring the extortion money, and copies of the intended victims' passports. Temkin also instructed Pavel that the extortion money should be moved into his Montevideo account, and that the victims should be taken on a boat ride and lost at sea. Pavel, in turn, advised Temkin that the job would be done when he left and confirmed that Temkin understood. Thus, Temkin's argument that the only permissible finding was that checking with his ex-FBI relative was "a condition precedent that he knew would never be satisfied" is unpersuasive. The evidence is sufficient to allow any rational trier of fact to find, beyond a reasonable doubt, that Temkin intended at the July 8th meeting that Pavel kill Hershman. *See Jackson*, 443 U.S. at 319.

## 2. Abandonment

Next, Temkin argues that even if there were sufficient evidence of his intent to solicit murder based on the July 8th meeting, in his subsequent voicemails he abandoned the plan. The "voluntary and complete renunciation" of criminal intent is an affirmative defense to the charge of solicitation. 18 U.S.C. § 373(b). Section 373(b) provides, however, that "[a] renunciation is not 'voluntary and complete' if it is motivated in whole or in part by a decision to postpone the commission of the crime until another time or to substitute another victim or another but similar objective." *Id.*

Temkin failed to meet his burden of proving a voluntary and complete renunciation "by a preponderance of the evidence." *Id.* The district court correctly found that the July 8th and 9th voicemails indicate Temkin's desire to avoid detection by law enforcement and, at most, a decision to delay—not to stop—the murder-for-hire. Viewing this evidence in the light most favorable to the prosecution, *Jackson*, 443 U.S. at 319, sufficient evidence supports the district court's rejection of Temkin's renunciation defense.

### B. *Interference with Commerce by Threats or Violence*

The Hobbs Act provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do, . . . shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). Section 1951(b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Under Count 2, Temkin was convicted of knowingly attempting "to intentionally obstruct, delay, and affect commerce, and the movement of articles and commodities in commerce, by extortion" in violation of the Hobbs Act. *See* 18 U.S.C. § 1951(a).

Sufficient evidence supports the district court's conclusion that Temkin took a substantial step toward carrying out his plan to extort and kill Hershman. While Temkin argues that he did not take a substantial step toward extortion because his plan was based on fictions invented by Malpezzi, factual impossibility is not a defense to an inchoate offense, such as the attempt for which Temkin was convicted.

*See United States v. Fleming*, 215 F.3d 930, 936 (9th Cir. 2000). Additionally, Temkin's abandonment argument fails because abandonment is not a defense when an attempt, as here, "has proceeded well beyond preparation." *United States v. Bussey*, 507 F.2d 1096, 1098 (9th Cir. 1974). Temkin met with Pavel, who he believed was a hitman, and gave him the intended victims' address and personal information, details about a bank account where Pavel could transfer the money he was to extort from Hershman, and $3,000 in cash. This evidence supports the district court's conclusion that Temkin's actions constituted a "substantial step," as a reasonable observer could conclude beyond a reasonable doubt that Temkin gave Pavel all that was necessary to provide him with the means of extorting and killing Hershman, in violation of the Hobbs Act. *See United States v. Scott*, 767 F.2d 1308, 1311–13 (9th Cir. 1985).

Sufficient evidence also supports the district's court's conclusion that interstate commerce "would have been affected in some way" by Temkin's acts. To prove that interstate commerce would have been affected for purposes of the Hobbs Act, "the government need only establish that a defendant's acts had a *de minimis* effect on interstate commerce." *United States v. Lynch*, 437 F.3d 902, 908 (9th Cir. 2006) (en banc) (per curiam). Furthermore, "[t]he government need not show that a defendant's acts actually affected interstate commerce." *Id.* at 909. Rather, proof of a potential impact on interstate commerce is sufficient. *Id.* Temkin's conduct involved phone calls, emails, hacking into email accounts, and the exchange of money; his extortion plan would have involved international travel and an overseas wire transfer. This evidence is more than sufficient to satisfy the requirement of a *de minimis* effect on interstate commerce. *See United States v. Lee*, 818 F.2d 302, 305 (4th

Cir. 1987).[1]  Viewing the evidence in the light most favorable to the prosecution, the district court could have found the essential elements of attempt to obstruct commerce by extortion beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319.

## C.  Murder-for-Hire

Under Count 3, Temkin was convicted of using interstate commerce facilities in the commission of murder-for-hire under 18 U.S.C. § 1958(a).  The statute includes, as an element, that a defendant "travel[] in or cause[] another (including the intended victim) to travel in interstate or foreign commerce, or use[] or cause[] another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed." 18 U.S.C. § 1958(a).  Sufficient evidence supports the district court's conclusion that Temkin's July 7, 2010 phone call with Pavel satisfies this requirement.

---

[1] Temkin raises two additional arguments in connection with Count 2 of the indictment, both of which are meritless.  First, Temkin argues that Count 2 is "fatally flawed" because it added the words "hire an individual," which are not included in the statute.  The insertion of these words could not have interfered with Temkin's understanding of the elements of the charged offense.  *See United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995) ("[A]n indictment is sufficient if it sets forth the elements of the charged offense so as to ensure the right of the defendant not to be placed in double jeopardy and to be informed of the offense charged.").  If anything, Temkin was more informed of the charge against him due to the added words.  Temkin also argues that there is no federal jurisdiction over Count 2 because his conduct could not have affected commerce in the United States.   As explained above, Temkin's threatening and harassing activities—phone calls, paying money to Pavel, and use of the internet—easily satisfy the interstate commerce requirement of the federal statute.

The July 7th telephone call qualifies as use of a facility of interstate commerce. *See* 18 U.S.C. § 1958(b)(2); *United States v. Nader*, 542 F.3d 713, 720 (9th Cir. 2008). Under the statute, Temkin must have used the telephone "with intent that a murder be committed." 18 U.S.C. § 1958(a). The July 7th call reflects not only Temkin's desire to hire Pavel but also a strong sense of urgency. During the phone call, Temkin expressed his desire to hire a hitman, agreed to provide identifying information for the intended victims, agreed to bring money to pay Pavel, and also expressed a desire that Pavel execute the plan quickly. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that Temkin used the telephone, a facility of interstate commerce, with the intent that a murder be committed. *See Jackson*, 443 U.S. at 319.

## D. Entrapment

The district court properly rejected Temkin's entrapment defense:

> When a defendant asserts an entrapment defense, the government must prove beyond a reasonable doubt that he was not entrapped by showing either: (1) the defendant was predisposed to commit the crime before being contacted by government agents; or (2) the defendant was not induced by the government agents to commit the crime.

*United States v. Mejia*, 559 F.3d 1113, 1116 (9th Cir. 2009) (internal quotation marks omitted). The district court correctly found predisposition. While we review entrapment,

a matter of law, de novo, we defer to credibility determinations made by the factfinder, unless, viewing the evidence in the light most favorable to the government, no reasonable factfinder could have concluded the defendant was either predisposed or not induced to commit the charged offenses. *See United States v. Si*, 343 F.3d 1116, 1124–25 (9th Cir. 2003).

The district court correctly found that Temkin was predisposed to commit the charged crimes, in part, because of "the way he dealt with Malpezzi, and the way he acted with 'Chet,' the first hitman."

> In evaluating predisposition, we consider five factors: (1) the character and reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement.

*United States v. Jones*, 231 F.3d 508, 518 (9th Cir. 2000). Of these five factors, "the most important is the defendant's reluctance to engage in criminal activity." *Id.* (internal quotation marks omitted).

Long before Temkin came into contact with either the Sheriff's Department or FBI undercover hitmen, Temkin became obsessed with getting even more money than Hershman owed him. Temkin stole from Hershman's storage unit and fraudulently gained information regarding Hershman's hospitalized daughter. As the district court noted, Temkin "is no stranger to law breaking as evidenced

by the breaking into the storage facility." Temkin initiated his first plan, to have Morrison poison Hershman, a plan interrupted by Morrison's arrest. Temkin then offered money to Malpezzi to kill Hershman. Unbeknownst to Temkin, Malpezzi, reluctant to participate in Temkin's murder-for-hire scheme, recorded their conversations and gave the recordings to the Sheriff's Department. It was only then that first "Chet" and then "Pavel" entered the picture. But, with their appearance on the scene, Temkin remained in charge of the plan, giving detailed instructions, and acting more urgently. In an early meeting, Temkin instructed Chet that he wanted Hershman killed and his family taken "as leverage." Temkin admitted he had given this plan "a great deal of thought." At one point, Temkin instructed Chet to rape Hershman's wife and daughter while Hershman and his son watched. Temkin again took the lead in planning the extortion and murder in his meetings with Pavel. Temkin did not show any reluctance to engage in criminal activity. *See United States v. McClelland*, 72 F.3d 717, 723 (9th Cir. 1995).

Law enforcement not only did not initiate the extortion and murder plot; they became involved only when it appeared that Temkin was taking substantial steps toward carrying it out. Moreover, besides revenge for a perceived wrong, Temkin was determined to carry out this scheme to obtain money, even after he had been repaid his initial loan. Because the district court correctly found that Temkin was predisposed to commit the crimes charged, we need not address inducement. *See United States v. Williams*, 547 F.3d 1187, 1197–99 (9th Cir. 2008). Sufficient evidence supports the district court's rejection of Temkin's entrapment defense.

## IV.  Procedural Sentencing Error

The district court sentenced Temkin to six years of imprisonment and three years of supervised release on each of his three counts of conviction, to be served concurrently. The district court, relying on the guidance of the Probation Office, calculated an offense level of 32 under U.S.S.G. § 2E1.4(a)(1), which governs the sentencing range for murder-for-hire. However, Temkin's correct offense level is 37 under U.S.S.G. § 2A1.5, which governs the sentencing range for conspiracy or solicitation to commit murder. The district court materially erred by using an offense level of 32, rather than 37, to calculate Temkin's sentencing range under the Guidelines.

### A.  Base Offense Level for Count 1

In Count 1, Temkin was convicted of soliciting a crime of violence under 18 U.S.C. § 373.[2]  Appendix A to the Guidelines provides the offense guideline sections that are applicable to the statute of conviction. *See* U.S. Sentencing Guidelines Manual 541–63 (2010).  The base offense level for a violation of 18 U.S.C. § 373 is dictated by either U.S.S.G. § 2A1.5 or § 2X1.1.  *Id.* at 546.  Section 2A1.5 governs "Conspiracy or Solicitation to Commit Murder." Section 2X1.1 governs solicitation offenses not covered by other specific offense guidelines.

---

[2] The parties agree that Count 2, attempted extortion in violation of the Hobbs Act, yields a lower base offense level than does either Count 1 or Count 3.  To determine the offense level applicable to Temkin's group of offenses, the court must determine the count with the highest base offense level. U.S.S.G. § 3D1.3(a).  Therefore, we discuss calculation of the base offense level for only Counts 1 and 3.

In Count 1, the "crime of violence" Temkin was convicted of soliciting was murder-for-hire in violation of 18 U.S.C. § 1958(a). Solicitation to commit murder-for-hire is a solicitation offense not specifically covered by its own Guidelines section. Thus, U.S.S.G. § 2X1.1 is the correct starting point for Count 1. Section 2X1.1 provides that the base offense level from the guideline for the "substantive offense" should be used to calculate the offense level. Section 2X1.1, Application Note 2 defines "substantive offense" as "the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit," here, 18 U.S.C. § 1958(a). Appendix A to the Guidelines indicates that U.S.S.G. § 2E1.4 applies to determine the sentencing range for a conviction under 18 U.S.C. § 1958. U.S. Sentencing Guidelines Manual 554 (2010). Thus U.S.S.G. § 2E1.4 controls the base offense level for Count 1.

The Government argues that the applicable Guidelines section for determining the base offense level for Count 1 is U.S.S.G. § 2A1.5, which covers "Conspiracy or Solicitation to Commit Murder." However, Temkin was not convicted of solicitation to commit murder. Temkin was convicted of solicitation to commit murder-for-hire in violation of 18 U.S.C. § 1958, and no Guidelines section expressly covers solicitation to violate 18 U.S.C. § 1958. While it is true that Temkin's underlying *conduct* in Count 1 would include solicitation to commit murder, U.S.S.G. § 2X1.1 instructs courts to look to the underlying "substantive offense" and not the underlying unlawful conduct.

Thus, in line with the Probation Office's instructions and the district court's analysis, U.S.S.G. § 2X1.1, which in turn leads to U.S.S.G. § 2E1.4, guides the base offense level calculation for Count 1. Section 2E1.4 is also the applicable

Guidelines section for determining the sentencing range for Count 3.

## B. *Base Offense Level for Count 3*

Under Count 3, Temkin was convicted of using interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958. As for Count 1, Appendix A to the Guidelines indicates that U.S.S.G. § 2E1.4 supplies the applicable base offense level for sentencing. U.S. Sentencing Guidelines Manual 554 (2010). Section 2E1.4(a) provides that the base offense level is the greater of "(1) 32; or (2) the offense level applicable to the underlying unlawful conduct." Section 2E1.4, unlike U.S.S.G. § 2X1.1, instructs courts to apply the offense level applicable to the *underlying unlawful conduct*, not the underlying substantive offense. Accordingly, the district court erred by using the base offense level of 32 set forth in U.S.S.G. § 2E1.4(a)(1). The district court should have used the cross-referencing provision in U.S.S.G. § 2E1.4(a)(2), because the unlawful conduct underlying Temkin's murder-for-hire conviction was solicitation to commit murder, which yields an offense level greater than 32. Under U.S.S.G. § 2A1.5, the base offense level for solicitation to commit murder is 33, plus a 4-level enhancement for the exchange of money. Thus, the correct offense level for Temkin's conviction is 37.

In 2004, U.S.S.G. § 2A1.5 was amended as part of an effort to increase the penalty for homicide offenses; the base offense level for conspiracy or solicitation to commit murder

was increased from 28 to 33.**[3]**  However, U.S.S.G. § 2E1.4, which falls in the category of "offenses involving criminal enterprises and racketeering," remained unchanged.  Before the 2004 amendments, solicitation to commit murder involving the exchange of money resulted in an offense level of 32 under U.S.S.G. § 2A1.5.  Section 2A1.5 set forth a base offense level of 28 and provided a 4-level enhancement for the exchange of money.  The offense level for the use of interstate commerce facilities in the commission of murder-for-hire under U.S.S.G. § 2E1.4(a)(1) was also 32.  However, after the 2004 amendments, the offense level for solicitation to commit murder involving the exchange of money jumped to 37 under U.S.S.G. § 2A1.5, which set forth the new base offense level of 33, and, as before, added the 4-level enhancement for the exchange of money.  The two subsections of U.S.S.G. § 2E1.4(a) enable the Guidelines section to keep pace with changes to U.S.S.G. § 2A1.5, while also maintaining a floor base offense level of 32.  That is, U.S.S.G. § 2E1.4(a)(1) ensures the base offense level does not drop below 32, while U.S.S.G. § 2E1.4(a)(2) keeps pace with changes to U.S.S.G. § 2A1.5 and related Guidelines sections by incorporating the offense level applicable to the underlying unlawful conduct.

While we have not addressed the interplay between U.S.S.G. § 2A1.5 and U.S.S.G. § 2E1.4 since the 2004 amendments to the Guidelines, two of our sister circuits have. In *United States v. Vasco*, the defendant, like Temkin, was convicted of using interstate commerce facilities in the

---

**[3]** *See* U.S. SENTENCING COMMISSION, *Amendments to the Sentencing Guidelines* 6–7 (May 10, 2004), http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20040430_RF_Amendments.pdf.

commission of murder-for-hire in violation of 18 U.S.C. § 1958. 564 F.3d 12, 15, 22 (1st Cir. 2009). At sentencing in *Vasco*, the district court applied the cross-referencing provision in U.S.S.G. § 2E1.4(a)(2). *Id.* at 22. The district court found that the "'underlying unlawful conduct' was solicitation to commit murder." *Id.* Section 2A1.5(b)(1), which corresponds to solicitation to commit murder, establishes a base offense level of 33, increased by 4 levels for the exchange of money. Accordingly, Vasco's offense level for his murder-for-hire conviction was 37 under U.S.S.G. § 2A1.5. *Vasco*, 564 F.3d at 22. The First Circuit noted that

> [t]he reference in § 2E1.4 to a [base offense level] of the greater of thirty-two or 'the offense level applicable to the underlying conduct' is curious, as virtually every time a defendant is charged with the use of interstate commerce facilities in the commission of murder-for-hire, the underlying unlawful conduct will be solicitation to commit murder.

*Id.* at 23. Nonetheless, the court concluded that "[w]e see no impropriety in the district court's having used the cross-reference" in U.S.S.G. § 2E1.4(a)(2). *Id.*

In *United States v. Dotson*, the defendant was also convicted of violating 18 U.S.C. § 1958 and was sentenced using an offense level of 37. 570 F.3d 1067, 1069 (8th Cir. 2009). As in *Vasco*, the "district court cross-applied U.S.S.G. § 2A1.5 for Conspiracy or Solicitation to Commit Murder, which has a base offense level of 33, and a 4-level increase if the offense involved the offer or receipt of anything of pecuniary value for undertaking the murder." *Id.* Dotson

argued that the cross-reference in U.S.S.G. § 2E1.4(a)(2) "should be applied only if the crime encompassed 'underlying unlawful conduct' *in addition to* that required to violate 18 U.S.C. § 1958." *Id.*   The Eighth Circuit rejected this argument, noting that it "is contrary to the plain language of § 2E1.4(a), which does not contain an additional conduct requirement." *Id.*; *see also United States v. Smith*, 755 F.3d 645, 647 (8th Cir. 2014).   The Eighth Circuit held that the district court did not err in calculating an offense level of 37. *Dotson*, 570 F.3d at 1070.**[4]**

We agree with the First and Eighth Circuits; the best interpretation of U.S.S.G. § 2E1.4(a) is its plain meaning. Section 2E1.4(a) instructs the use of the greater of "(1) 32; or (2) the offense level applicable to the underlying unlawful conduct."   Solicitation to commit murder is the unlawful conduct underlying Temkin's conviction under 18 U.S.C. § 1958(a), and the offense level for solicitation to commit murder involving the exchange of money is greater than 32. It may be true that solicitation to commit murder is routinely the unlawful conduct underlying a murder-for-hire conviction.   Thus, in determining the base offense level for

---

**[4]** The United States District Court for the District of New Mexico has also addressed the interplay between U.S.S.G. § 2A1.5 and U.S.S.G. § 2E1.4, reaching the same conclusion as the First and Eighth Circuits. *United States v. Summers*, 506 F. Supp. 2d 686, 695 (D.N.M. 2007).   In *Summers*, the United States Probation Office contacted the United States Sentencing Commission "in an effort to obtain clarification on the application of § 2E1.4, as this guideline is not commonly applied in the District of New Mexico."   *Id.* at 692.   A Sentencing Commission representative confirmed that it was proper to calculate an offense level of 37 for a violation of 18 U.S.C. § 1958, using U.S.S.G. § 2E1.4(a)(2)'s cross-reference to incorporate U.S.S.G. § 2A1.5's base offense level of 33 and adding four levels for the exchange of money.   *Id.*

murder-for-hire under U.S.S.G. § 2E1.4, § 2E1.4(a)(2)'s cross-reference to U.S.S.G. § 2A1.5 will typically control given that § 2A1.5's base offense level has increased to 33. However, this does not "read out" the base offense level of 32 in U.S.S.G. § 2E1.4(a)(1). Rather, the Sentencing Commission uses the cross-referencing provision in U.S.S.G. § 2E1.4(a) to ensure this Guidelines section keeps pace with increases to the base offense level set forth in U.S.S.G. § 2A1.5 and related Guidelines sections, while maintaining a minimum base offense level of 32. The plain language of U.S.S.G. § 2E1.4(a) indicates that a sentencing judge should "[a]pply the greater" of the two methods, and the cross-reference method results in the greater offense level. Therefore, the district court committed procedural error by failing to apply the cross-referencing provision in U.S.S.G. § 2E1.4(a)(2).

\*    \*    \*

In sum, under either Count 1 or Count 3, Temkin's offense level should have been set by U.S.S.G. § 2A1.5. The offense level for solicitation to commit murder under U.S.S.G. § 2A1.5 is 37—33, with a 4-level increase for the "offer or the receipt of anything of pecuniary value for undertaking the murder." U.S.S.G. §§ 2A1.5(a), (b)(1). Accordingly, Temkin's offense level is 37.[5] Thus, the district

---

[5] An offense level of 37 corresponds to a Guidelines range of 210–262 months for Temkin's criminal history category of I. The statutory maximum for Count 3, 18 U.S.C. § 1958(a), is ten years (120 months) if no personal injury results. However, the statutory maximum under Count 2, 18 U.S.C. § 1951(a), is twenty years (240 months). When sentencing on multiple counts of conviction, the total sentence imposed may be greater than the statutory maximum for a particular count. *See* U.S.S.G. § 5G1.2(b); *see also id.*, Application Note 3. Under U.S.S.G. § 5G1.2(d),

court erred in using an offense level of 32 to calculate Temkin's Guidelines range.

The district court's error in calculating the offense level was not harmless. The district court must begin its sentencing analysis with the correct Guidelines range. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) (per curiam). We cannot deem this error harmless because the district court did not perform any alternative analysis or provide any explanation for what the sentence would have been under an offense level of 37. *See id.* at 1030 n.5. We must therefore vacate Temkin's sentence and remand for resentencing. Because the district court erred in calculating the proper Guidelines range, we do not reach the question of whether the sentence is substantively reasonable. *See United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006).

## V. Conclusion

Sufficient evidence supports Temkin's conviction. However, at sentencing, the district court materially erred in calculating the proper Guidelines range. Accordingly, we affirm all three counts of Temkin's conviction, but vacate his sentence and remand for resentencing.

**AFFIRMED in part, VACATED in part, and REMANDED.**

---

"[i]f the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment."