NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3839
_____

UNITED STATES OF AMERICA

v.

GARY WILLIAMS,
                    Appellant

_____

On Appeal from the District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 3-12-cr-00179-002)
District Judge: Honorable A. Richard Caputo
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
October 27, 2015

Before: GREENAWAY, JR., SCIRICA, and ROTH, <u>Circuit Judges</u>

(Filed: April 25, 2016 )

_____

OPINION[*]
_____

**SCIRICA**, *Circuit Judge.*

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Gary Williams was convicted by a jury of conspiracy to commit murder-for-hire and several related crimes. He now appeals his conviction on two grounds: (1) the trial court improperly introduced reputation evidence in violation of Federal Rule of Evidence 404(b); and (2) the court misapplied the sentencing guidelines in calculating Williams's murder-for-hire sentence. We will affirm.

## I.

While serving time in Pike County Correctional Facility for crimes unrelated to this case, Gary Williams entered into an agreement with his cellmate Edward McLaughlin, who asked Williams to murder his ex-wife. Together, they agreed that McLaughlin would provide a firearm, bullets, and a few thousand dollars to Williams to carry out the killing, once Williams was released from jail.

After leaving jail, Williams moved in with his girlfriend, Gloria Soto. While living there, he received a shipment from McLaughlin containing a Mauser rifle intended to be used to murder McLaughlin's ex-wife. On May 29, 2012, with the Mauser rifle, Williams shot at Soto in her apartment and beat her face with the rifle butt. Responding to a 911 domestic violence call by Soto, police arrested Williams while he was fleeing from the scene. They discovered bullets and a bullet hole in the apartment and documented Soto's bruised face.

Subsequently, Soto told police about the murder-for-hire plot which Williams had revealed to her while living in her apartment. She consented to a police search of her apartment for evidence related to the Mauser rifle and the conspiracy, and police

2

uncovered the rifle. Police also found letters between McLaughlin and Williams and other evidence revealing details of the murder plan. Soto cooperated with police and agreed to make recorded phone calls to Williams and McLaughlin to confirm details of the plot.

Gary Williams was indicted by a federal grand jury on five counts: conspiracy to commit murder-for-hire, 18 U.S.C. § 1958 (Count 1); possession and carrying a firearm during and in relation to and in furtherance of a crime of violence, 18 U.S.C. § 924(c) (Count 2); receipt of a firearm in interstate commerce with the intent to commit a felony offense, 18 U.S.C. § 924(b) (Count 3); unlawful possession of a firearm as a convicted felon, 18 U.S.C. § 922(g)(1) (Count 4); and attempting to corruptly persuade a witness with the intent to influence the witness's testimony in an official proceeding, 18 U.S.C. § 1512(b)(1) (Count 5). Edward McLaughlin was also indicted, and the district court severed their cases.[1]

Williams was convicted on all five counts. At trial, the prosecution presented evidence through witness testimony from Soto, police officers, and the brother and ex-wife of co-conspirator McLaughlin. The prosecution also introduced numerous exhibits, letters between Williams and McLaughlin that were read into evidence, and audio recordings of telephone conversations between Williams and Soto and Williams and McLaughlin.

Pursuant to the pre-sentence investigation report, the court applied the sentencing

---

[1] This case is a companion case to *United States v. McLaughlin*, No. 15-1193, also decided today. McLaughlin had pleaded guilty to conspiracy to commit murder-for-hire and other crimes, and the companion case denies his motion to withdraw his guilty plea.

3

guidelines noting the guideline for conspiracy to commit a murder-for-hire (Section 2E1.4), carried a base offense level of 32. The instructions to this guideline, however, direct a court to apply either the base offense level of 32 or the base offense level of the underlying unlawful conduct, whichever is higher. The underlying unlawful conduct in this case is conspiracy to commit a crime of violence, which has a separate guideline— Section 2A1.5—and carries a higher base offense level of 33. The court applied Section 2A1.5 and its higher base offense level along with various enhancements set forth by the guidelines. Because Williams had a lengthy criminal history, was designated a career offender (Criminal History Category VI), and was given an offense level of 39, the court sentenced him to 420 months in jail.[2]

## II.

Williams appeals his conviction on two separate grounds.[3] First, he contends the trial court improperly admitted reputation evidence in violation of Rule 404(b) of the Federal Rules of Evidence. Because Williams did not object to admission of this evidence at trial, we review for plain error. *United States v. Christie*, 624 F.3d 558, 567 (3d Cir. 2010).

Second, Williams argues the court incorrectly applied the sentencing guidelines by applying Section 2A1.5 rather than Section 2E1.4. Williams contends the court's application of the guidelines highlights a redundancy and leads to an unintended result— that Section 2E1.4 will never be applied to conspiracy to commit murder-for-hire and is

---

[2] His sentencing range under the sentencing guidelines was 420 months to life in jail.
[3] The district court had jurisdiction pursuant to 18 U.S.C. § 3231 and we have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

therefore superfluous. We review a court's interpretation of the sentencing guidelines *de novo* when a defendant makes an objection at sentencing. *United States v. Fountain*, 792 F.3d 310, 318 (3d Cir. 2015). But where, as here, "an objection [to application of sentencing guidelines] is not preserved at sentencing, we review that challenge for plain error." *Id.*; *see United States v. Bernard*, 373 F.3d 339, 341 (3d Cir. 2004) (same); *United States v. Knight*, 266 F.3d 203, 206-07 (3d Cir. 2001) (applying plain error standard to defendant's unpreserved claim of error regarding application of sentencing guidelines); *see also* Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

### III.

Williams argues the prosecution introduced reputation evidence which lacked a proper purpose and violated Rule 404(b) of the Federal Rules of Evidence. Where reputation evidence is extrinsic to a charged offense, it falls under Rule 404(b) and may be admitted if "it is (1) offered for a proper purpose under Rule 404(b)(2); (2) relevant to that purpose; (3) sufficiently probative under the Rule 403 balancing requirement; and (4) accompanied by a limiting instruction, if requested." *United States v. Davis*, 726 F.3d 434, 441 (3d Cir. 2013); *see also Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. Green*, 617 F.3d 233, 244 (3d Cir. 2010).

But "Rule 404(b) does not extend to evidence of acts which are 'intrinsic' to the charged offense." *United States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002) (quoting Advisory Committee Notes to Fed. R. Evid. 404(b)). When evidence is intrinsic to proof of the crimes charged, "there is no other wrongful conduct at issue; the evidence is

5

admissible as part and parcel of the charged offense." *Green*, 617 F.3d at 245 (internal

quotation marks omitted). Evidence is intrinsic if it directly proves the charged crime, or

if it is concerned with contemporaneous acts which facilitated the commission of a

charged offense. *See Green*, 617 F.3d at 248-49.

The government contends the evidence Williams challenges was intrinsic to the

charged crimes, and as a result, the Rule 404(b) restrictions do not apply.[4] *See Davis*,

726 F.3d at 441. The prosecution gave Williams advance notice of the categories of the

evidence it planned to introduce at trial. As noted, Williams did not object to admission

of the evidence or request limiting instructions. His failure to object deprived the court of

the opportunity to rule or give limiting or curative instructions to the evidence now

contested.

We have reviewed the record and all the evidence. Most of it is intrinsic but some

may be difficult to categorize. But no objection was made to the evidence, and as noted

we review under plain error.

**A.**

Williams describes several instances of evidence which he says violated Rule

404(b). We have grouped the allegedly improper character evidence into five categories

to facilitate our analysis, and discuss each of them in turn.

---

[4] The government also contends that even if any of the evidence is extrinsic evidence, it would satisfy Federal Rule of Evidence 404(b). We do not reach this issue because we conclude that, even if the evidence was extrinsic, its admission does not warrant reversal under our plain error review.

**B.**

Williams met McLaughlin in jail where they formed a friendship and discussed the details and motive of the plot to murder McLaughlin's ex-wife. Williams now objects to the admission of evidence about his incarceration, including jail records confirming he spent time there. This evidence was introduced through letters and phone calls between Williams and McLaughlin which were read to the jury. These calls and letters, often made from jail or referring to jail, were integral to the formation and development of their relationship and established the details of the murder-for-hire conspiracy and other charged crimes.[5] Testimony from Soto also referred to Williams's imprisonment in the context of describing their abusive relationship. This evidence is directly probative of, or is concerned with contemporaneous acts which facilitated, the conspiracy to commit murder-for-hire, the corruptly persuading a witness charge, and the firearm charges.

**C.**

Second, Williams contests the admission of evidence highlighting his abusive behavior toward Soto. Much of this evidence came from testimony by Soto who told the jury of Williams's possession of the rifle, the nature of his and her relationship with

---

[5] For example, in correspondence to Soto from jail, Williams described his efforts to send letters out of jail to McLaughlin without jail officials noticing: "Oh, by the way, I'm getting letters out to Ed. They don't know it, nor will they be able to figure it out. I established a new underground way to write him through a third party and have them mail it to someone else to him, or someone he knows. Cool thing about being around state convicts. Yeah, I have a whole block of state guys just begging to help me out." In a separate letter to Soto, mailed from jail, Williams said "The feds did not offer me any deal so I did not give up Ed as far as his wife. Besides, I do not know if I could have gone through with it anyway. Now you have to do your part." He then instructs Soto on what to say to investigators in order to hide evidence of his wrongdoing and "get us both off the hook."

7

McLaughlin, and Williams's efforts to convince Soto to lie to the police and cover up evidence of his illegal actions. With respect to his upcoming trial and her anticipated testimony on behalf of the prosecution, Williams told her to be "afraid" because she "lied and perjured" herself and threatened to "get [her] thrown out of housing." He summarized his anger toward her by saying "[i]t's about time you got a little pay back" and "then your worst nightmare will come true. So you do what you got to do, cause I'm gonna do what I got to do." On a separate occasion, he threatened to kill her if she ever revealed the conspiracy.[6] Furthermore, Williams routinely threatened Soto with violence and claimed he would end their relationship.[7] These threats and other statements are directly probative of, or are concerned with contemporaneous acts which facilitated, the conspiracy to commit murder-for-hire, the corruptly persuading a witness charge, and the firearm charges. This evidence is also probative of Soto's fear of Williams based on his previous abusive behavior toward her, a fear which he exploited in threatening or cajoling her to alter or fabricate her testimony. It is, therefore, intrinsic to proving that Williams attempted to corruptly persuade a witness.

### D.

Third, Williams takes issue with evidence of his drug use. Williams called Soto from jail to complain about being in the jail's "detox" unit for heroin use—a statement

---

[6] Williams displayed a longstanding pattern of violence and abuse toward Soto. On one occasion, he told her "to either start cleaning the house or he was going to shoot [her]." He then retrieved the Mauser rifle and shot at her.

[7] He once said "You best be cleaning that f***ing house too you lazy f***. God, you're so much like your mother. I hope you break that habit, baby, otherwise I can't promise you a successful [traumatic brain injury] treatment. We don't need any more outbursts now, do we?"

8

calculated to elicit her sympathy and assistance so that she would fabricate stories to the government to help secure his release. This statement occurred during a phone conversation to Soto that was played for the jury which consisted of threats[8] alongside apologies for his aggression toward Soto, combined with entreaties to talk to the government and help him get out of jail. The conversation also contained references to the conspiracy to commit murder-for-hire. It followed a pattern of correspondence designed to coerce Soto into helping him get out of jail through false statements. It is directly probative of, or is concerned with contemporaneous acts which facilitated, his efforts to corruptly persuade Soto to alter or fabricate her testimony.

### E.

Fourth, Williams challenges other evidence of verbal and physical abuse against Soto, including the 2012 domestic violence incident when Williams shot at her and beat Soto with the rifle. Most of these comments occurred in the context of letters between Williams and Soto or their telephone conversations which were recorded by the police with Soto's permission. Williams's actions in furtherance of the conspiracy intimately involved his relationship with Soto. The rifle was mailed to her apartment, and she accompanied Williams to the shooting range and to the intended victim's home to scope out the property. Williams frequently used her telephone to communicate with McLaughlin. This evidence is directly probative of, or is concerned with contemporaneous acts which facilitated, the conspiracy to commit murder-for-hire and

---

[8] For example, Williams told Soto "Now listen, we can, if you help me . . . I promise nothing ever bad is going to happen to you I wasn't making, I wasn't trying to have anything bad happen to you to begin with, I was just trying to scare you, okay?"

the firearm possession charges.   And as discussed, the evidence of abuse is probative of the corruptly persuading a witness charge because his pattern of alternating threats against Soto and pleas for her help sought to compel her to lie to investigators.

**F.**

Fifth, Williams objects to the admission of evidence in letters he sent to Soto from jail that he had a mental illness or a traumatic brain disorder and that he planned to file various lawsuits against government entities for "illegally locking [him] up" and other mistreatment.  He requested her help in researching various mental illnesses or brain defects in an attempt to self-diagnose himself and convince Soto he was not culpable for various past misdeeds.  Williams made statements while in jail, at the same time that he was urging Soto to alter or fabricate her testimony to the government.  The statements are directly probative or are concerned with contemporaneous acts which facilitated the charge of corruptly persuading a witness because they are part of a pattern of abuse designed to induce Soto to alter or fabricate her testimony.

**G.**

Even if there was error in admitting any of the evidence in question, there was no violation of Williams's substantial rights.  Under the plain error doctrine, we may correct an error not raised at trial only if  "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 560 U.S. 258, 262

10

(2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).  If there was error, it was not clear or obvious.  Rather it was subject to reasonable dispute.  Furthermore, it did not seriously affect the fairness, integrity or reputation of the trial.  And significantly, because there is ample evidence supporting Williams's conviction, evidence that does not implicate Rule 404(b), admission of the evidence in question did not affect the outcome of the trial, even if it was erroneous.[9]

Principally and significantly, the government presented correspondence found in Soto's home between McLaughlin and Williams revealing details of the murder-for-hire conspiracy, an analysis of phone records probative of contact with each other, and other supporting evidence probative of the crime. The government proved Williams took overt acts in furtherance of the murder conspiracy, including taking the rifle to the shooting range and staking out the intended victim's house.  The government also provided evidence obtained as a result of lawful searches of Williams's and McLaughlin's homes probative of the crimes.  This evidence included a Mauser rifle box with a shipping label from McLaughlin's home city, the Mauser rifle, 8mm Mauser bullets, a bullet hole in the wall and casings on the floor of Soto's apartment, laptop, documents and a letter in McLaughlin's home sent by Williams. In addition, the government proved that the rifle in question was mailed by McLaughlin to Williams for use in the planned murder.

---

[9] Because admission of the evidence did not affect the outcome of the trial, it did not affect Williams's substantial rights. As such any error was harmless and we would disregard it.  Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *United States v. Lewis*, 802 F.3d 449, 454 (3d Cir. 2015) (internal quotation marks omitted) ("[T]he over-arching consideration of Rule 52 is whether an error affects substantial rights." (quoting *United States v. Adams*, 252 F.3d 276, 281 (3d Cir. 2001))).

## IV.

Williams also appeals the trial court's application of the sentencing guidelines in calculating his sentence for conspiracy to commit murder-for-hire (Count 1). Under any standard of review, including *de novo* review, the court did not commit error by applying Section 2A1.5 and sentencing Williams to a higher term than he would have received had the court applied Section 2E1.4 (which would have resulted in a sentencing range of 235-293 months, followed by the mandatory 60 month sentence for Count 2).[10] *See* Br. Appellant at 19.

Specifically, Williams takes issue with the decision to apply Section 2A1.5 (Conspiracy or Solicitation to Commit Murder) instead of Section 2E1.4 (Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire). But the plain language of Section 2E1.4 compels this result. It directs a court to apply the greater base offense level of either Section 2E1.4, which is 32, or that of the "underlying unlawful conduct." U.S.S.G. § 2E1.4. The underlying conduct is conspiracy to commit murder, which is covered by Section 2A1.5 of the sentencing guidelines. Section 2A1.5 results in a higher base offense level—33.

The court added four levels to the base offense level of 33 in accordance with Section 2A1.5 because Williams was convicted of conspiracy to commit murder-for-hire. U.S.S.G. § 2A1.5(b)(1) ("If the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder, increase by 4 levels."). Following Section

[10] Williams has an extensive criminal history record which was not disclosed during trial but which was considered by the court in his sentencing. At the time of sentencing Williams had a criminal history category of VI.

12

3C1.1 of the guidelines, the court added two more levels to Williams's offense level because of his attempts to corruptly persuade a witness, resulting in an aggregate level of 39. The court then sentenced Williams to 420 months in jail (360 months, plus a mandatory 60 month consecutive sentence for Count 2, possession and use of a firearm during and in relation to a crime of violence). The sentencing guidelines, through the language in Section 2E1.4, plainly require a more severe penalty for conspiracy to commit murder when another guideline with a higher base offense level is available. U.S.S.G. § 2E1.4 ("Apply the greater" base offense level of "32; or the offense level applicable to the underlying unlawful conduct.").

Williams has not been able to point to a case in any circuit that contradicts this application of the guidelines. On the contrary, the Courts of Appeals for the First, Second, Eighth, and Ninth Circuits have upheld this application of the guidelines. *See, e.g.*, *United States v. Lisyansky*, 806 F.3d 706, 709-11 (2d Cir. 2015); *United States v. Temkin*, 797 F.3d 682, 695 (9th Cir. 2015); *United States v. Smith*, 755 F.3d 645, 647 (8th Cir. 2014); *United States v. Dotson*, 570 F.3d 1067, 1069-70 (8th Cir. 2009); *United States v. Vasco*, 564 F.3d 12, 23 (1st Cir. 2009); *see also United States v. Garcia*, 204 F. Supp. 2d 790, 795 (D.N.J. 2002) (applying the cross reference to Section 2A1.5).

Williams claims the cross reference to Section 2A1.5 creates a redundancy. Due to the cross reference, he contends, there will almost never be a time when a defendant convicted of conspiracy to commit murder-for-hire, 18 U.S.C. § 1958, will be sentenced under Section 2E1.4 and its lower base level offense. We disagree. As noted in *United States v. Smith*:

13

> To be convicted of violating 18 U.S.C. § 1958(a) an individual need only travel or use a facility of interstate commerce, or cause another to do so, *intending* a murder be committed for hire. Although an offer of something of value in exchange for the commission of murder will be made at some point, 18 U.S.C. § 1958(a) does not require that the offer have been made or accepted before the statute is violated. As a violation of 18 U.S.C. § 1958(a) does not require the unlawful conduct involve an offer or receipt of something of pecuniary value per se, U.S.S.G. § 2E1.4(a)(1) is not superfluous.

755 F.3d at 647. Even if this were not so, we would still uphold the guideline because the guidelines reflect a deliberate choice to incorporate the cross reference: "The Sentencing Commission uses the cross-referencing provision in U.S.S.G. § 2E1.4(a) to ensure this Guidelines section keeps pace with increases to the base offense level set forth in U.S.S.G. § 2A1.5 and related Guidelines sections, while maintaining a minimum base offense level of 32." *Temkin*, 797 F.3d at 695-96 & n.4 ("A Sentencing Commission representative confirmed that it was proper to . . . us[e] U.S.S.G. § 2E1.4(a)(2)'s cross-reference to incorporate U.S.S.G. § 2A1.5's base offense level of 33.").

We agree with our sister circuits that the best interpretation of Section 2E1.4 is its plain meaning. Because the district court followed the clear instructions of the guidelines in a reasonable manner, we do not find error.

## V.

For the foregoing reasons, we will affirm the judgment of conviction and sentence.

14