**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2932-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

GARY J. PASSARELLI, a/k/a
JOSEPH J. POLLIN,

    Defendant-Appellant.

_____

Argued on October 31, 2018 – Decided December 17, 2018

Before Judges Koblitz, Currier and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Hunterdon County, Indictment No. 13-11-0388.

Edward J. Hesketh argued the cause for appellant (Law Offices of Edward J. Hesketh, LLC, attorneys; Edward J. Hesketh, of counsel and on the brief).

Jeffrey L. Weinstein argued the cause for respondent (Anthony P. Kearns, III, Hunterdon County Prosecutor, attorney; Jeffrey L. Weinstein, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Gary J. Passarelli appeals from his February 19, 2016 conviction after trial of first-degree murder, N.J.S.A. 2C:11-3(a), third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d), and third-degree possession of the controlled dangerous substance (CDS) Ketamine, N.J.S.A. 2C:35-10(a)(1). Defendant was sentenced to sixty years in prison with an 85% parole disqualifier pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He argues that his videotaped statement to police and evidence of his drug use should not have been admitted into evidence, the State committed prosecutorial misconduct and his sentence was manifestly excessive. After reviewing the record in light of the contentions advanced on appeal, we affirm all but the sentence. We remand for reconsideration of the sentence without consideration of aggravating factors three, "[t]he risk that the defendant will commit another offense," N.J.S.A. 2C:44-1(a)(3), and nine, "[t]he need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9).

The following evidence was adduced at trial. On May 31, 2013, at 12:53 p.m., a police officer found the victim's body lying on the floor in his living room with a large kitchen knife sticking out of the victim's abdomen. The officer

observed dumbbells near the victim's feet and an inflatable child's swimming pool covering the victim's face and chest.

Defendant described the victim, John Niko, as a social acquaintance. According to defendant, after not seeing each other for a period of time in 2012, defendant and Niko resumed their relationship beginning in March 2013, and used Ketamine together. On May 20, 2013, defendant was issued a motor vehicle violation in Raritan Township, which resulted in his Ford F-250 black pickup truck being impounded, and he called Niko, who picked defendant up at the police station and allowed defendant to stay at his home.

On May 30, 2013, defendant and Niko exchanged various text messages, phone calls and voicemails regarding defendant's laptop computer that Niko had repaired and defendant was trying to retrieve. Defendant became hostile because he wanted Niko to bring the laptop to him. Defendant testified he was not angry, but rather that was how he and Niko spoke to each other.

Between 5:40 and 5:54 a.m. on May 31, defendant and Niko exchanged a series of phone calls, text messages, and voicemails. Defendant left a voicemail message on Niko's phone at 5:41 a.m., saying:

> Listen mother fucker, you are fucking dead man walkin'
> . . . you understand what I'm sayin' to you right now,
> you're a fucking dead man walking . . . the next time I
> see you, I'm gonna fucking knock every fucking tooth

out of your fucking face . . . you got what I'm sayin' mother fucker . . . I'm going to fuck you up like you've never thought you could be possibly be fucked up, you piece of fucking shit.

Two minutes later, the defendant left another threatening and vulgar voicemail message.

Niko responded twice by text message at 5:50 a.m. and 5:53 a.m., first saying he would call the police and then writing "I did nothing wrong to you. I redid your whole laptop. You were supposed to come get it last night and didn't."

Several of Niko's neighbors heard noises coming from Niko's home on that May 31, 2013 morning beginning at approximately 6:00 a.m. and saw a black Ford F-250 pickup truck parked in Niko's driveway.

A New Jersey State Police expert provided testimony regarding a DNA analysis of evidence collected from the crime scene. The evidence included the handle of the knife found in the victim's abdomen, the dumbbell, and the children's pool. The dumbbell contained a mixture of DNA – blood that matched the victim's DNA and, according to forensic scientist Elliot Clark, defendant could not be ruled out as a partial contributor of DNA. The children's pool that covered the victim's upper body and the knife found in his body were also tested for DNA, and contained both the victim's and defendant's DNA. Only defendant

and the victim were DNA contributors on the knife, and Clark agreed that a reason for this was that a knife typically gets washed.

The State's expert witness opined that the cause of the victim's death was multiple blunt trauma and sharp force injuries. He concluded the victim's head and face injuries could not have been inflicted by punches due to the severity of the facial deformity inflicted. Examination of the injuries to the victim's chest showed a circular pattern with a hole in the center, consistent with being hit by a dumbbell. Due to the small amount of blood in the victim's abdominal cavity, the knife stab to that area was inflicted after his death.

The owner of an auto detail shop testified that on the morning of May 31, 2013, he noticed cuts on the defendant's hands and, rather than shake hands, defendant used his elbow.

John Bertini, the owner of a car wash and a longtime friend of defendant, testified defendant arrived in his pickup truck on the morning of May 31, 2013 at approximately 11:30 a.m. and, after the truck was washed, the two went to Bertini's office, where defendant took out a container and offered him a "bump" of Ketamine. Defendant then admitted he killed Niko, stating "I did it, I killed John Niko." Defendant said Niko was stealing customers.

A-2932-15T4

A detective testified that during a search of defendant's home in North Plainfield, he found a "Tic Tac" container with Ketamine inside and a separate cylinder on a keychain also containing Ketamine.

Defendant testified at trial, denied killing Niko, and related the following. He and Niko purchased Ketamine from a man named "Busy." Niko owed Busy $3000 for Ketamine, so defendant tried to arrange a meeting between Busy and Niko on May 31 at 5:00 a.m. When Niko did not arrive for the meeting, defendant led Busy to Niko's home, parked in the driveway while Busy parked on the street, and told Busy to wait outside while he spoke to Niko.

Defendant explained to Niko that he brought Busy to address the debt. Niko was drinking heavily and ingesting Ketamine. He was upset defendant brought Busy to his home, the two argued about the issue, and then the two fought. Niko threw the first punch and defendant countered with several punches that knocked Niko down. Defendant did not use a dumbbell or knife during the fight. When defendant opened the front door to leave, Busy and another man were standing right outside and, although he did not see the men enter, defendant assumed they entered Niko's home.

6

Defendant denied telling anyone he killed Niko. Any marks defendant had on his hands were not from the fight with Niko. He may have touched a kitchen knife or a workout dumbbell while at Niko's residence in the past.

Defendant raises the following issues on appeal:

> POINT I: THE TRIAL COURT ERRED BY FAILING TO SUPPRESS THE VIDEO-TAPED STATEMENT MADE BY DEFENDANT DURING HIS CUSTODIAL INTERROGATION.
>
> POINT II: THE COURT ERRED IN PERMITTING EVIDENCE OF THE DEFENDANT'S DRUG USE TO BE PRESENTED TO THE JURY IN THIS CASE SUBSTANTIALLY PREJUDICING THE DEFENDANT.
>
> POINT III: THE PROSECUTOR MADE IMPROPER SUMMATION COMMENTS THAT DEPRIVED DEFENDANT OF THE RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL.
>
> POINT IV: THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE.
>
> POINT V: THE AGGREGATE ERRORS DENIED DEFENDANT A FAIR TRIAL.

### I. Motion to Suppress  Defendant's Statement

At approximately 4:00 p.m. on May 31, 2013, defendant was taken to the North Plainfield Police Department. He was questioned by Sergeant Michael

Nugent and Detective Aaron Lacey from the Hunterdon County Prosecutor's Office in an interview room that was video and audio-recorded.

They advised defendant of his constitutional rights and confirmed he understood them. Defendant then informed the detectives he wanted his lawyer. Defendant gave the names of several lawyers, said that he would not talk to anyone, and wanted to know what happened to Niko. The detectives told defendant he did not have to talk to them, then told defendant that Niko was dead and left the room. The detectives returned and told defendant he was not free to leave because they were conducting an investigative detention.

While defendant was alone in the interview room, he damaged the audio equipment recording the interview. He was arrested for causing the damage and put in a holding cell. According to Sergeant Michael Schutta, defendant initiated a discussion, apologizing for the damage and saying he was willing to talk. Schutta advised defendant that he had invoked his right to counsel. Defendant said he wanted to speak to the prosecutor's office and Schutta relayed defendant's request to Nugent and Lacey.

Defendant told the prosecutor's officers: "I don't want a lawyer" and said he "was trying to cover his track." They read defendant his Miranda[1] rights

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

again, informing defendant afterwards that his decision "to waive these rights is not final and you may withdraw your waiver at any time." Defendant asked to waive his rights.

The officers resumed questioning defendant. Defendant admitted he was at Niko's home that morning and claimed he was walking out with his laptop computer bag when he saw a man he did not know walking in. Defendant said he was there just to pick up his laptop. The officers informed defendant he was a suspect in the homicide, and they had obtained a search warrant for defendant's home and pickup truck.

Prior to being informed of the search warrant, defendant and the officers had an exchange regarding defendant's hospitalization for suicidal thoughts. He concluded that discussion stating: "That's it, man, that's a wrap. What time is it?" The discussion continued.

Later on, when the detectives suggested that perhaps while defendant was at Niko's home, they were using Ketamine, Niko turned on defendant, and a scuffle ensued resulting in defendant killing Niko in self-defense. Defendant asked:

> MR. PASSARELLI: Do you think I should get
> a lawyer at this point?
>
> DETECTIVE LACEY: He was drinking like a

fiend.

MR. PASSARELLI: Can I get a lawyer at
this point?

DETECTIVE LACEY: That's up to you.
Listen, if you don't wanna talk to me anymore, I can
leave the room.

MR. PASSARELLI: I mean, listen, man.

DETECTIVE LACEY: I'm on -- here's the
thing though, Gary. I'm on your side.

MR. PASSARELLI: If that's your theory,
bro, that's your theory.

DETECTIVE LACEY: It's -- Gary, I --

MR. PASSARELLI: I am not confessing to anything
cause I didn't do anything.

Afterward, defendant continued the interview, admitted he and Niko got into a

physical alteration, but maintained he did not kill Niko.

"[O]n appellate review, a trial court's factual findings in support of

granting or denying a motion to suppress must be upheld when 'those findings

are supported by sufficient credible evidence in the record.'" State v. S.S., 229

N.J. 360, 374 (2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). After

a testimonial hearing, "appellate courts defer to the trial court's factual findings

because the trial court has the 'opportunity to hear and see the witnesses and to

have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (quoting State v. Elders, 192 N.J. 224, 244 (2007)). An appellate court "should not disturb a trial court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'" Ibid. (quoting Gamble, 218 N.J. at 425).

Defendant filed a motion to suppress his statements to the police, arguing the comments "that's a wrap" and "can I get a lawyer at this point?" were invocations of defendant's right to remain silent and right to an attorney. The motion court found that the detectives honored defendant's initial invocation of his right to counsel. The court stated the detectives initially stopped questioning defendant, reminded him of his request to speak to his attorney, and never asked any further questions about the homicide but instead led him to a jail cell. The court held it was defendant who voluntarily reinitiated the questioning by the detectives. The court pointed to the fact that defendant apologized for damaging the audio equipment and confirmed that he understood his rights and was waiving them. The court also rejected defendant's argument that the Ketamine in defendant's system had any effect on his ability to provide a knowing, voluntary and intelligent waiver at that time.

The motion court also rejected defendant's argument that during the interview he re-invoked his right to remain silent a second time. The court denied defendant's motion to suppress his statements to the detectives.

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and [New Jersey's] common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "[P]olice must adequately and effectively advise an individual of his [or her] right to remain silent, and other rights, before questioning." Id. at 382.

Under the New Jersey privilege against self-incrimination, even a suspect's ambiguous assertion of the right to remain silent "must be diligently honored." Ibid. (quoting State v. Bey (Bey II), 112 N.J. 123, 142 (1988)). "Words used by a suspect are not to be viewed in a vacuum, but rather in 'the full context in which they were spoken.'" Ibid. (quoting State v. Roman, 382 N.J. Super. 44, 64 (App. Div. 2005)).

To determine the voluntariness of a defendant's confession, a court must look "to the totality of the circumstances to assess whether the waiver of rights was the product of free will or police coercion." Nyhammer, 197 N.J. at 402. The circumstances a court should consider include a defendant's "age, education

and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." Ibid. (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

"If an accused does initiate a conversation after invoking his rights, that conversation may be admissible if the initiation constitutes a knowing, intelligent, and voluntary waiver of the accused's rights." State v. Chew, 150 N.J. 30, 61 (1997) (citing Miranda, 384 U.S. at 444). "A suspect 'initiates' if he invites conversation on the crimes for which he is being held." State v. Melendez, 423 N.J. Super. 1, 30 (App. Div. 2011) (citing State v. Fuller, 118 N.J. 75, 82 (1990)).

Here, defendant reinitiated the conversation with Detective Schutta, stating that he no longer wanted an attorney and wanted to speak with the detectives. The detectives re-read defendant's Miranda rights and advised defendant he could re-invoke those rights at any time. Defendant indicated he understood and proceeded to talk to the detectives about the victim. The detectives scrupulously honored defendant's invocation of his rights and defendant knowingly and voluntarily waived those rights. See Melendez, 423 N.J. Super. at 30.

The motion court found that the comments "That's it man.  That's a wrap," read in their proper context, were about moving the conversation past defendant's mental health issues and not about invoking his right to remain silent.

Defendant's statements of "Do you think I should get a lawyer at this point?" and "Can I get a lawyer?" are closer to an ambiguous invocation of defendant's right to counsel.  The court applied the proper standard when reviewing these statements under State v. Alston, 204 N.J. 614, 623 (2011).  In Alston, where the defendant asked a hypothetical question about getting an attorney and the detective responded "that's on you," the Court concluded the defendant's question was only a question, not an invocation of his rights, and the detective's response was truthful and accurate.  Id. at 626-27.  Here, the court reasoned that, as in Alston, defendant was simply asking the detective for his opinion about obtaining an attorney and did not invoke his right to counsel.  Detective Lacey's response was truthful and accurate.  Read in the context of the entire statement, where defendant clearly understood his right to remain silent, having invoked that right initially, these later statements were not indicative of an intention to revoke his waiver.

## II. Admissibility of Drug Evidence

"[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Nantambu, 221 N.J. 390, 402 (2015) (alteration in original) (quoting State v. Harris, 209 N.J. 431, 439 (2012)).

Defendant argues that the evidence of CDS did not conform to the indictment and was overly prejudicial as evidence of prior bad acts. He argues for the first time on appeal that the court constructively amended defendant's indictment by allowing the State to prove possession of CDS at a different location than charged in the indictment.

The State counters that although the indictment was incorrect because it charged defendant with possession of the CDS at the murder site in Raritan, as opposed to defendant's home in North Plainfield, where the CDS was found, defendant was on notice of this fact and did not raise it to the trial court. The State argues defendant was given a full and fair opportunity to mount a defense and the fact that he did not point this discrepancy out to the trial court means he was not prejudiced.

There are "two types of variations between the indictment and evidence." United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985). These variations are:

> amendments, which occur when the charging terms of the indictment are altered, and variances, where the charging terms are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment. The difference between these variations is not merely academic, for we observed that Supreme Court precedent indicated that if the variation were characterized as an amendment, it would constitute a per se violation of the fifth amendment's grand jury clause. Variances, however, are subject to less strict case-by-case inquiry, and would only constitute reversible error in those cases where the variance prejudiced the defendant's defense.
>
> [Id. at 1121-22 (citations omitted).]

An indictment "must sufficiently identify the criminal event to enable the accused to defend and to defeat a subsequent prosecution for the same offense; hence, the indictment must allege all the essential facts of the crime." State v. Lamb, 125 N.J. Super. 209, 216 (App. Div. 1973). If evidence presented at trial "substantially adhere[s] to that outlined in the indictment and the indictment supplies sufficient information to apprise defendant of the actual charge against him [or her], thus avoiding any possible prejudice, and protects him [or her]

against a subsequent prosecution for the same offense, the variance will be deemed immaterial." Id. at 217.

Defendant did not raise his argument concerning a constructive amendment to the indictment to either the motion court during the State's motion in limine hearing, nor during trial. The plain error standard thus applies and this error "shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . ." R. 2:10-2.

The charging terms were not altered, but rather the evidence proved possession of the CDS was not in Raritan as charged, but in North Plainfield. Therefore, the variation is not an amendment but rather a variance. See Castro, 776 F.2d at 1121. The test then becomes whether defendant was prejudiced by the variance. Id. at 1121-22. Defendant was on notice of the proofs and had ample time to mount a defense. He was not prejudiced by the variance. See Lamb, 125 N.J. Super. at 217.

Defendant also argues the trial court erred in allowing testimony regarding statements defendant made to Bertini regarding defendant's drug use. He contends the statements are prohibited under N.J.R.E. 404(b). Defendant argues Bertini's statements were other-crimes evidence and should have been analyzed under the Cofield standard. See State v. Cofield, 127 N.J. 328, 333-35 (1992).

17

"Once evidence is deemed relevant, it is admissible, N.J.R.E. 402, unless 'its probative value is substantially outweighed by the risk of [ ] undue prejudice,' N.J.R.E. 403, or some other bar to its admission is properly interposed." Nantambu, 221 N.J. at 402 (alteration in original) (quoting Brenman v. Demello, 191 N.J. 18, 34-35 (2007)).

"[E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." N.J.R.E. 404(b).

"To aid courts and litigants in making the threshold determination of whether the evidence relates to 'other crimes' or is intrinsic to the charged crime," Rose instructs that a court must look to the applicable test provided by United States v. Green, 617 F.3d 233 (3d Cir. 2010). State v. Rose, 206 N.J. 141, 180 (2011). The test "provides a workable, narrow description of what makes uncharged acts intrinsic evidence of the charged crime, and therefore not subject to Rule 404(b)'s directed purpose requirements." Ibid. Our Supreme Court quoted the Third Circuit's explanation:

> [W]e . . . reserve the "intrinsic" label for two narrow categories of evidence. First, evidence is intrinsic if it "directly proves" the charged offense. This gives effect to Rule 404(b)'s applicability only to evidence of "other crimes, wrongs, or acts." If uncharged misconduct directly proves the charged offense, it is not evidence

of some "other" crime. Second, "uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime." But all else must be analyzed under Rule 404(b).

[Rose, 206 N.J. at 180 (quoting Green, 617 F.3d at 248-49).]

The court held Bertini's statements were intrinsic to the possession of CDS charge because the statements directly proved defendant had knowledge of his possession of the ketamine. Bertini stated defendant offered him a "bump" of ketamine from a small container that was later determined to be the same container police found in defendant's home. The court did not err in holding Bertini's statements were intrinsic evidence that directly proved the charged CDS offense, and not extrinsic evidence of other crimes.

## III. Prosecutorial Misconduct

A reviewing court must "evaluat[e] the severity of [prosecutorial] misconduct and its prejudicial effect on the defendant's right to a fair trial . . . ." State v. Wakefield, 190 N.J. 397, 437 (2007) (first alteration in original) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). "[P]rosecutorial misconduct is not grounds for reversal of a criminal conviction unless the conduct was so egregious as to deprive defendant of a fair trial." Ibid. (quoting Papasavvas, 163 N.J. at 625). "[T]o justify reversal, the prosecutor's conduct

must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Id. at 438 (quoting Papasavvas, 163 N.J. at 625).

Defendant argues the prosecutor made improper comments during summation by incorrectly suggesting that the knife found in the victim's abdomen had been washed before the incident, thus eliminating prior DNA contributors. The court overruled defendant's objection. Defendant also argues the prosecutor improperly bolstered the law enforcement officers, by stating the officers "believe in justice" and should be found credible.

Prosecutors "should not make inaccurate legal or factual assertions during a trial and . . . must confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." Wakefield, 190 N.J. at 437 (quoting State v. Reddish, 181 N.J. 553, 641 (2004)). A prosecutor is, however, "afforded considerable leeway in making opening statements and summations." State v. Echols, 199 N.J. 344, 359-60 (2009) (quoting State v. Williams, 113 N.J. 393, 447 (1988)). A prosecutor "is entitled to be forceful and graphic in his [or her] summation to the jury, so long as he [or she] confines himself to fair comments on the evidence presented." State v. DiPaglia, 64 N.J. 288, 305 (1974).

Here, the prosecutor did not commit misconduct that was "so egregious as to deprive defendant of a fair trial." See Wakefield, 190 N.J. at 437. Expert testimony revealed defendant's DNA was found on the knife used to stab the victim. The expert testified that one explanation for only defendant's and the victim's DNA on the knife was because the knife was washed prior to the incident. The prosecutor's statement thus did not misrepresent the evidence, but was a "reasonable inference[] to be drawn from that evidence." See id. at 437-38.

The prosecutor's statements regarding the police officers' credibility and that they "believe in justice," are similar to those considered improper in State v. Murphy, 412 N.J. Super. 553, 559-63 (App. Div. 2010) (finding it improper for a prosecutor to state in summation that the police had "no stake in the outcome of this proceeding"). The statements, however, do not amount to conduct "so egregious as to deprive defendant of a fair trial." See Wakefield, 190 N.J. at 437. The evidence against defendant was overwhelming. Thus, the improper prosecutorial statements did not deprive defendant of a fair trial. See State v. R.B., 183 N.J. 308, 331-32 (2005) (declining to reverse although the prosecutor improperly argued the police had no motive to lie).

## IV. Sentence

We apply "a deferential standard of review to the sentencing court's determination, but not to the interpretation of a law." State v. Bolvito, 217 N.J. 221, 228 (2014). "Appellate review of a criminal sentence is limited; a reviewing court decides whether there is a 'clear showing of abuse of discretion.'" Ibid. (quoting State v. Whitaker, 79 N.J. 503, 512 (1979)). We may not "substitute [our] judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). The test is "whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." State v. Ghertler, 114 N.J. 383, 388 (1989).

We must ensure the trial court followed the appropriate sentencing guidelines. We must affirm a sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 363-64 (1984)).]

To determine the appropriate sentence, a sentencing court must consider aggravating and mitigating factors pursuant to N.J.S.A. 2C:44-1(a) and (b). The court found aggravating factors one, two, three, and nine and found mitigating factor six, giving it minimal weight, but refused to find mitigating factor four, stating defendant's drug and alcohol use did not excuse his criminal behavior. Aggravating factor one is that the crime was committed in an "especially heinous, cruel, or depraved manner," N.J.S.A. 2C:44-1(a)(1); factor two is "[t]he gravity and seriousness of harm inflicted on the victim" and whether the victim is particularly vulnerable, N.J.S.A. 2C:44-1(a)(2). Defendant does not object to these findings. Mitigating factor six is that a defendant "has compensated or will compensate the victim of his conduct for the damage or injury that he [or she] sustained," N.J.S.A. 2C:44-1(b)(6), and factor four is "substantial grounds tending to excuse or justify the defendant's conduct," N.J.S.A. 2C:44-1(b)(4).

The court sentenced defendant to a sixty-year term of imprisonment for murder with two concurrent five-year terms of imprisonment for the knife and CDS charges. Under NERA, defendant was obligated to serve fifty-one years before being eligible for release. Defendant was forty-two years old at the time of sentencing and thus was essentially sentenced to spend the rest of his life in prison without the possibility of parole.

23

Although defendant does not appeal aggravating factors one and two, we note that it is a close question as to whether this murder was particularly heinous when compared to other murders, and whether the harm inflicted on the victim was beyond that of most other murders. See State v. Soto, 340 N.J. Super. 47, 71-72 (App. Div. 2001) (affirming the application of aggravating factor one in an aggravated manslaughter and felony murder case where the defendant brutally and viciously attacked the victim). An element of the offense may not be cited as an aggravating factor to increase punishment. Fuentes, 217 N.J. at 74-75.

Defendant argues his sixty-year sentence was excessive because it was defendant's first indictable conviction and the minimum sentence of thirty years without parole is sufficiently harsh. Defendant further argues the sentencing court erred by finding aggravating factor three, N.J.S.A. 2C:44-1(a)(3), because the court "failed to articulate how there was a specific risk that this defendant would commit another offense." This was defendant's first indictable conviction. Defendant's prior history, which began in 1995, consisted of a completed twelve-month term of PTI for possession of a CDS in 2001, a final restraining order against defendant by his brother, and nine disorderly persons convictions for offenses including simple assault, disorderly conduct,

harassment, and creating a disturbance. The trial court concluded that defendant's criminal history demonstrated "a loss of control and continued assaultive behavior" necessitating a longer sentence. We disagree. Although defendant had a history of petty offenses, the evidence that defendant would reoffend at the age of seventy, after serving the mandated minimum of thirty years, was scant.

Regarding aggravating factor nine, "[t]he need for deterring the defendant and others from violating the law," N.J.S.A. 2C:44-1(a)(9), defendant argues the court erred because the record did not establish a special need to deter defendant. The court noted defendant's failure to show any remorse or take any responsibility for his actions. A defendant's lack of remorse and consistent denial of wrongdoing may establish a need to deter the defendant from similar conduct in the future. N.J.S.A. 2C:44-1(a)(9); State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991). However, the court must consider the defendant's parole eligibility. N.J.S.A. 2C:44-1(c)(2). In a murder case where the mandatory minimum sentence is thirty years without parole, using defendant's lack of remorse as a reason to increase that penalty is perilously close to a penalty for going to trial. See N.J.S.A. 2C:44-1(c)(1) (stating that going to trial in itself may not be considered in sentencing). Under these circumstances,

25

aggravating factors three and nine were not based on credible evidence and should not have been considered.  See State v. Kromphold, 162 N.J. 345, 355 (2000).  The imposition of sixty years in prison with an 85% parole disqualifier on a middle-aged offender with no prior indictable convictions, who would be ninety years old when he is eligible for parole, shocks our judicial conscience.  See State v. Blackmon, 202 N.J. 283, 297 (2010) (citing Roth, 95 N.J. at 364).

Moreover, empirical evidence suggests that incarceration of inmates, such as defendant, into old age generally results in overburdened prisons while offering little in terms of public safety.  The Pew Charitable Trusts & the John D. and Catherine T. MacArthur Foundation, State Prison Health Care Spending: An Examination, 9 (Jul. 2014), https://www.pewtrusts.org/~/media/assets/2014/07/stateprisonhealthcarespendingreport.pdf.  Similarly, "studies demonstrate that the risk of recidivism is inversely related to an inmate's age."  United States v. Howard, 773 F.3d 519, 532-33 (4th Cir. 2014) (citing Tina Chiu, It's About Time: Aging Prisoners, Increasing Costs, and Geriatric Release, Vera Inst. of Justice (Apr. 2010), https://storage.googleapis.com/vera-web-assets/downloads/Publications/its-about-time-aging-prisoners-increasing-costs-and-geriatric-release/legacy_downloads/Its-about-time-aging-prisoners-increasing-costs-

and-geriatric-release.pdf) (vacating the life sentence of a forty-one-year-old defendant as substantively unreasonable where the defendant had been considered a potential recidivist based on stale crimes).

We reverse and remand for resentencing without consideration of aggravating factors three and nine and with consideration of defendant's age at his earliest possible release.

## V. Cumulative Error

To reverse and remand for a new trial based on cumulative error, an appellate court must find "that the probable effect of the cumulative error was to render the underlying trial unfair." Wakefield, 190 N.J. at 538.  Applied to these facts, the argument is without sufficient merit to require further discussion. R. 2:11-3(e)(2).

Affirmed in part and reversed and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2932-15T4